**ELLIS–FOSTER COMPANY, Plaintiff,**
v.
**PITTSBURGH PLATE GLASS COM-PANY and Lunn Laminates, Inc.,**
**Defendants.**
**Civ. No. 11017.**

United States District Court
E. D. New York.
Aug. 16, 1955.

Simpson, Thacher & Bartlett and Eyre, Mann & Burrows, New York City, Albert C. Bickford, New York City, of counsel, for plaintiff.

Cahill, Gordon, Reindel & Ohl, New York City, Carlson, Pitzner, Hubbard & Wolfe, Chicago, Ill., Raymond S. Chisholm, Pittsburgh, Pa., Richard R. Wolfe, Chicago, Ill., Loftus E. Becker, New York City, Raymond S. Chisholm, Pittsburgh, Pa., and Irwin Schneiderman, New York City, of counsel for defendants.

BRUCHHAUSEN, District Judge.

This is an action for infringement of United States Patent No. 2,255,313, brought by plaintiff, Ellis-Foster Company, hereinafter called "Ellis-Foster" against defendant, Pittsburgh Plate Glass Company, hereinafter called "Pittsburgh" and defendant, Lunn Laminates, Inc., hereinafter called "Lunn".

The principal allegations of the complaint are as follows:

"3. On September 9, 1941 United States Patent No. 2,255,313 was duly and legally issued to Plaintiff for an invention in Ethylenic-Alpha-Beta-Synthetic Resins and Process of Making Same on an application filed by Carleton Ellis; and since that date Plaintiff has been and still is the owner of said Letters Patent.

"4. Plaintiff alleges that defendants jointly and severally have been and still are infringing the aforesaid Letters Patent by making, using and selling resinous compositions embodying the patented invention. Further, Plaintiff alleges that Defendants have jointly infringed the aforesaid Letters Patent by each Defendant carrying out a part of the patented process in such manner that the complete process of said Letters Patent is carried out in its entirety by these Defendants acting in concert. * * * "

The plaintiff claims that its patent comprises a process of mixing certain acids, also called anhydrides, and alcohols, forming a resinous composition. It may be thinned by adding styrene. A filler may be added to give it strength although there are instances where purchasers of the material do not use fillers. (Tr. 135, 136.) The manufacturers sell the material in liquid form to purchasers, usually fabricators, who make solid articles therefrom by a step called "polymerization", i. e., hardening it in a mold by the application of heat and pressure. The plaintiff does not contend that its patent covers the manufacture or sale of the ingredients or chemicals but does assert that the patent relates to the process of mixing the ingredients into a resinous product.

The sole issue involved on this trial was whether the defendants, customers of American Cyanamid Company and Bakelite Corporation or their subsidiaries, were licensed to use the patent, the defendants having raised the issue by a separate defense in each of the answers to the effect that the acts complained of were authorized by license. The defendants base their defenses on the license, granted by the plaintiff to American Cyanamid Company, dated December 18, 1936, defendants Exhibit O, and upon the license, granted by the plaintiff to Bakelite Corporation, dated January 9, 1946, defendants Exhibit V. It is not disputed that the burden of proof is upon the defendants. The interpretation of the said agreements is in controversy and the parties have introduced considerable evidence as to the events leading up to the making of the agreements and the operations thereunder, to aid in ascertaining the intent of the parties thereto.

The principal provisions of the Cyanamid agreement are as follows:

"Whereas, Ellis-Foster owns certain inventions and/or discoveries in the field of synthetic resins and synthetic balsams made from polybasic acids (and/or their anhydrides) and polyhydric alcohols, and in the field of substances produced by the reaction of polybasic unsaturated acids of the maleic acid (or its anhydride) type with other unsaturated compounds, and likewise owns certain Letters Patent and Applications therefor covering inventions and/or discoveries in said fields;

* * * * * *

"Article First
"Definitions
"A. Alkyd Resin Field. The term 'alkyd resin field', as used in this Agreement, shall be deemed to mean the field of synthetic resins and synthetic balsams (synthetic balsams being herein defined as soft to liquid substances generally resembling balsams in respect of their physical properties), which synthetic resins and synthetic balsams are made from polybasic acids (and/or their anhydrides) and polyhydric alcohols with or without monobasic acids, fats and/or fatty oils as modifiers, and on coating compositions in which such synthetic resins and/or synthetic balsams form an essential or dominating part.

"B. Ellisol Field. The term 'Ellisol field', as used in this Agreement, shall be deemed to mean the field of substances produced by reaction of polybasic unsaturated

acids of the maleic acid (or its anhydride) type with other unsaturated compounds.

\*   \*   \*   \*   \*   \*

"Article Second

"Grant of Non-Exclusive License to Cyanamid

"A. Ellis-Foster hereby grants unto Cyanamid (for itself and its subsidiaries), on the terms and conditions hereinafter set forth, a non-exclusive, royalty-free right and license to practice:

"1. the inventions and/or discoveries disclosed in and/or covered by the patents and/or patent applications set forth on the schedules hereto annexed as Exhibit 'A', entitled 'Alkyd Resin Patents', and Exhibit 'B', entitled 'Ellisol Patents', and/or in any Letters Patent issued on said applications and/or extensions or reissues thereof, now or hereafter owned or controlled by Ellis-Foster;

\*   \*   \*   \*   \*   \*

"B. This license extends to customers of Cyanamid or its subsidiaries, who purchase from Cyanamid or its subsidiaries materials or products within the alkyd resin field and/or the Ellisol field, as to the specific materials or products so purchased; i. e., the customer shall enjoy the same license as to the specific materials and/or products so purchased that its vendor would have enjoyed in all further dealings with or utilizations of such materials and/or products."

The defendants' witness, Mr. James Edwin Archer, patent attorney for said Cyanamid Company, testified that the said agreement constitutes a license to the said company under the patent in suit herein. (Tr. 121.)

Mr. Archer, on cross-examination by the plaintiff, also gave the following testimony:

"Q. Did you at the time of these inquiries or any other time ever represent to the United States Rubber Company or the Interchemical Corporation that they would obtain a license under this patent in suit if they bought this phthalic anhydride or the Maleic anhydride? A. If that representation was made it was certainly unauthorized by the company.

"Q. You don't know of any such representation that was made? A. I am sure that if such a representation was made it was unauthorized.

"Our policy, as stated on the pamphlet that you handed me, which has been marked Exhibit 6, stating that 'Nothing contained herein shall be construed to imply the nonexistence of any relevant patent nor to constitute permission, inducement or recommendation to practice any invention covered by any patents owned by the American Cyanamid or by others without authority from the owner of the patent.'

"Q. You did tell them however that American Cyanamid was licensed under the patent in suit? A. That is correct.

"Q. And what did you tell them—

"The Court: Tell who?

"Mr. Bickford: The United States Rubber and the Interchemical Corporation that American Cyanamid was licensed under the patent.

"The Witness: We told them that the license to manufacture polyester resins, that we had that license to manufacture polyester resins and to pass on to the customer the right to use that resin which we had manufactured to produce the finished product under the patent and to practice the process in order to produce that product.

"Q. You told them that you were licensed to pass on to a customer of Laminates a license to use? A. That is right." (Tr. 149, 150.)

Mr. Archer's interpretation of the agreement, according to his testimony, supports the plaintiff's contention that

the customers of the licensees were only given the right to use the resin, manufactured and sold by the licensee.

The relevant provisions of the Bakelite Agreement are as follows, viz.:

"Whereas, the parties hereto have previously entered into a certain license agreement dated January 9, 1942, under which Ellis-Foster granted to Bakelite a non-exclusive license under the following Letters Patent of the United States which are also the subject matter of this Agreement:

\* \* \* \* \* \*

"U. S. Patent 2,195,362, March 26, 1940; 'Glycol Maleic Acid Resin and Process of Making Same'

\* \* \* \* \* \*

"relating to synthetic resinous condensation products of ethylenic alphabeta unsaturated dibasic acids and dihydric alcohols and the resinous polymerization products thereof with vinyl compounds;

\* \* \* \* \* \*

"Now, Therefore, the parties hereby agree as follows:

\* \* \* \* \* \*

"3. Ellis-Foster hereby grants to Bakelite and its affiliated corporations a paid-up non-exclusive license to make, use and sell the inventions of the aforesaid Letters Patent and any reissues thereof during the full life of each of said patents together with the right to Bakelite and its affiliated corporations to extend to their customers the right to make, use and sell the inventions of the aforesaid patents but only in connection with materials purchased from Bakelite or its affiliated corporations. The aforesaid extension of rights to customers shall be deemed to have been granted by Bakelite or its affiliated corporations when the materials are sold by Bakelite or its affiliated corporations and shall include sales made during the life of the previous agreement dated January 9, 1942, as well as sales made under this agreement.

\* \* \*"

The plaintiff's witness Burrows testified that in none of the conversations with Mr. Rush, representing the Bakelite Company, preceding the execution of the agreement with that company, did they discuss chemical ingredients. (Tr. 329.) On direct examination for the defendants Mr. Rush stated that the word "materials" in the agreement was intended to mean any products manufactured by the company and that this point was discussed, during the negotiations, leading to the making of the agreement. His testimony, on cross examination, does not lend support to the defendants' case. When pressed for details of the conversations on this subject, he asserted that his memory of the events was not precise, that he did not remember the number of conferences, that his recollection was hazy and that he did not remember whether glycol was mentioned. (Tr. 173, 174, 200–210.) Furthermore, the defendants furnished no explanation for the failure to produce Messrs. Weith and Sheffler, associates of Mr. Rush's company, who participated in the negotiations.

As previously mentioned, the aforesaid agreements pertain to licenses under plaintiff's patent, bearing No. 2,255,313. It is settled law that the claims therein and not the specifications afford the measure of the grant to the patentee. Milcor Steel Co. v. George A. Fuller Co., 316 U.S. 143, 145, 62 S.Ct. 969, 86 L.Ed. 1332; Borg-Warner Corporation v. Mall Tool Company, 7 Cir., 217 F.2d 850, 855. The first four claims refer to a "process of making a hardened light colored resinous product", comprising the reaction of alcohol and acid. Claim No. 4 is the only one mentioning a filler as a requirement. Claims Nos. 5 and 6 are substantially identical to Claims Nos. 1 and 2, respectively.

After a careful consideration of all of the evidence, the Court concludes that the defendants' defenses of license have not been sustained and that the plaintiff is entitled to a decree accordingly.