AMERICAN CYANAMID COMPANY, Plaintiff,

v.

ELLIS–FOSTER COMPANY, Defendant.

ELLIS–FOSTER COMPANY, Plaintiff,

v.

AMERICAN CYANAMID COMPANY, Defendant.

Civ. Nos. 325–59, 239–60.

United States District Court
D. New Jersey.

Dec. 19, 1960.

John D. McMaster, Jersey City, N. J., Davis, Hoxie, Faithfull & Hapgood, John Hoxie, James E. Ryder, New York City, of counsel, for American Cyanamid Co.

Steelman, Lafferty, Rowe & McMahon, William Rowe, Newark, N. J., Simpson, Thacher & Bartlett, Albert C. Bickford, New York City, of counsel, for Ellis-Foster Co.

MEANEY, District Judge.

The American Cyanamid Company in an action instituted on April 22, 1959 seeks a declaratory judgment asking for interpretation of a patent license agreement entered into with Ellis-Foster Company, further asking for injunctive relief and damages against the Ellis-Foster Company. Subsequently on June 2, 1959 the Ellis-Foster Company began an action against American Cyanamid Com-

pany alleging infringement of U. S. Patent No. 2,255,313 owned by Ellis-Foster Company. The actions were consolidated and trial was had on the issues involved.

These issues are whether American Cyanamid Company's product, Laminac, is licensed under U. S. Patent No. 2,255,313 and a corresponding German patent, both owned by Ellis-Foster Company, and further whether Ellis-Foster Company is estopped from asserting these patents against American Cyanamid Company or its customers. The validity of U. S. Patent No. 2,255,313 is also questioned.

Preliminary to the discussion of these issues it is necessary to review the pre-existing relations existing between American Cyanamid Company (hereinafter referred to as Cyanamid) and Ellis-Foster Company (hereinafter referred to as Ellis-Foster) as well as the sequence of the patents involved. In 1928 Ellis-Foster and Cyanamid were associated in a joint venture through formation of Rezyl Corporation, the stock of which was owned in the following proportion: Cyanamid 75%, Ellis-Foster 25%. Cyanamid furnished capital and manufactured and sold products for Rezyl, and Ellis-Foster did research for Rezyl. The association continued until December 1936 when Cyanamid bought out Ellis-Foster's interest in Rezyl, existing agreements with Rezyl were terminated and a license agreement, the source of the present dispute between the parties, was entered into.

The license agreement, in part, reads as follows:

### Article Second
### Grant of Non-Exclusive License to Cyanamid

A. Ellis-Foster hereby grants unto Cyanamid (for itself and its subsidiaries), on the terms and conditions hereinafter set forth, a non-exclusive royalty-free right and license to practice:

2. any inventions and/or discoveries in the alkyd resin field made during the period commencing October 5, 1928 and ending July 14, 1937, both dates inclusive, owned and/or controlled by Ellis-Foster during such period, disclosed in any applications for Letters Patent or Letters Patent and/or any extensions or reissues thereof, irrespective of the date on which any such application shall have been filed or upon which any such patent shall have issued;

3. any inventions and/or discoveries in the alkyd resin field made during the period commencing on October 5, 1928 and ending on July 14, 1937, both dates inclusive, owned and/or controlled by Ellis-Foster during said period, whether said inventions and/or discoveries are patented or not;

It is with the interpretation of this part of the agreement that there is question.

The patents involved are Ellis-Foster Patent No. 2,195,362, hereinafter referred to as 362, Ellis-Foster Patent No. 2,255,313, hereinafter referred to as 313, and its corresponding German patent, hereinafter referred to as the German patent.

Patent 362 was first in the field, issued March 26, 1940, application May 21, 1936. That was followed by patent 313, issued September 9, 1941, application August 6, 1937.

Both parties to this suit admit that, by the license agreement of 1936, Cyanamid had a non-exclusive and royalty-free right and license under patent 362. The difficulty arose from the manufacture and sale by Cyanamid of a product known as Laminac which Ellis-Foster claims infringes patent 313 and the German patent.

For approximately a dozen years after Cyanamid started the sale of Laminac it appears that Cyanamid acted on the theory that it was authorized by the 1936 licensing part of the agreement to manufacture and sell the product and this with knowledge on the part of respon-

sible parties in the Ellis-Foster Company. Further, during that time it seems to have been the understanding of Ellis-Foster that Cyanamid was so licensed. It was not until 1958 that Ellis-Foster alleged that the manufacture and sale of Laminac were a trespass on the patents 313 and its German equivalent. In that year one of Cyanamid's customers sold Laminac resin for the making of button blanks to a Belgian subsidiary which in turn sold the button blanks to a customer in Germany. This German customer was notified that it was infringing the German patent owned by Ellis-Foster. Thereafter the fat was in the fire, as Ellis-Foster had in 1953 given exclusive rights under the German patent to two German companies.

Previous to 1958, as suggested above, Ellis-Foster had, tacitly at least, agreed with Cyanamid in its contention that Cyanamid was licensed under 313. In a letter to Ellis-Foster Cyanamid made such a claim in an attempt to purchase patent 313. Ellis-Foster while knowing of Cyanamid's production of Laminac never until 1958 charged Cyanamid with infringement of patent 313, though it had frequently prosecuted others for alleged infringement thereof. Throughout the course of their relations after the 1936 agreement and after the production of Laminac there was implicit recognition on the part of Ellis-Foster of the Cyanamid claim without any repudiation of it. In the course of litigation with other parties there was frequent open declaration by representatives of Ellis-Foster that Laminac was a product of Cyanamid made under license from Ellis-Foster. For instance, in the case of Ellis-Foster Co. v. Pittsburgh Plate Glass Co. and Lunn Laminates, Inc., 132 F.Supp. 674 tried in the Eastern District of New York in February, 1955, counsel for Ellis-Foster stated "When Lunn Laminates buys Laminac, that is licensed. We are not suing Lunn Laminates for having purchased Laminac from American Cyanamid. That is licensed." Further, in his opening to the court in the same case counsel for Ellis-

Foster said "We concede that any sales by American Cyanamid of its resinous materials which it sells under the trade name of Laminac carries with it the license." It is evident therefore that previous to the German stir-about, both parties were agreed that Laminac was produced under appropriate license from Ellis-Foster. This angle of the case will be adverted to later herein.

Aside from the concept of licensing heretofore referred to, there is to be settled just what comprehension is to be given to the term "alkyd resin field" as used in paragraphs 2 and 3 of the grant of non-exclusive license to Cyanamid in the 1936 agreement. That it is more extensive than a term which might refer solely to an esterified but uncopolymerized alkyd resin, is self-evident. To this court it would seem that the term "alkyd resin field" indubitably includes all products, a necessary component part of which in the course of their development is an alkyd resin.

There is the further problem of the patentability of the subject matter of 313. Ellis-Foster contends that there is novelty not disclosed in 362. The distinguishing feature of 313, insofar as the court has been able to epitomize the chemical complexities of both 362 and 313 would seem to be the addition of monomeric styrene or an equivalent to the reaction of a dibasic acid with a dihydric alcohol. In the figurative representation of the polymerization of a maleic-glycol polyester, there is a cross linking of one alkyd chain to unite it with another similar chain. In figure, the theoretical linking by the addition of styrene gives, after copolymerization, a structure representing a cross linking of one alkyd chain to a similar one with styrene as an intervening link between the maleic units of the linear chain of the alkyds with maleic units of similar alkyd linear chains, there being no cross linking between the glycol units as there is none between the glycol units where styrene is not used. Whether this copolymerization with styrene is sufficiently disclosed and adequately foreshadowed in the polymerization of the alkyd resin alone,

as set forth in 362, is the question. To a vast body of minds untutored competently in chemistry (and evidently to some minds deeply versed in the science) it may be inferred that experimentation in the field already described in 362 could very easily result in the development of copolymerization by means of styrene or other auxiliary material without the necessity for the presence of "the flash of genius" or even extraordinary ingenuity such as would classify the operation as an invention.

Issue was made of the geographical extent of the 1936 license. Cyanamid claims it is world-wide; Ellis-Foster claims it is limited to the United States. Ellis-Foster relies on Article 3 of the 1936 license agreement as embodying the only rights in foreign patents contemplated by the agreement:

### Article Third

### Prosecution of Patents

Cyanamid shall have the primary responsibility of working and paying taxes under each of said foreign patents shown on said Exhibit A annexed hereto in respect of which it shall at the time be the sole licensee of Ellis-Foster; but Cyanamid may at any time desist from making any further payment of taxes or conducting any required working in respect of any such foreign patent, provided it gives to Ellis-Foster reasonable notice of its intention so to do in order to enable Ellis-Foster, at its discretion, to maintain such patent at its own expense; and upon giving any such notice, all rights of Cyanamid and its subsidiaries hereunder under such patent shall forthwith cease and terminate.

As to any future patents to be applied for in foreign countries on inventions covered by this Agreement, in the event that Ellis-Foster does not proceed to apply for, or cause to be applied for on its behalf, in any foreign country, a patent on any invention and/or discovery covered by this Agreement, within ninety (90) days after receiving a written request from Cyanamid to do so, Cyanamid may apply for, or cause to be applied for, such patent in its own behalf and at its own expense and Ellis-Foster shall (without expense to itself) fully cooperate with Cyanamid to such end; and in any such event Cyanamid shall be the sole owner of any Letters Patent that may be obtained on such application.

Reading the license agreement as a whole, it appears that Article 3 does not purport to deal with license rights, but was intended to protect Cyanamid against Ellis-Foster's inaction in foreign countries. Article 2 deals with license rights. In the absence of territorial limitation of a subject-matter license the licensee's immunity from suit by the patentee is complete immunity.

From all of the foregoing this court concludes:

1. 313 and as a corollary the German patent do not set forth patentable invention, sufficient disclosure having been made in 362 to warrant this finding.

2. Even if 313 were to be found valid, the subject matter thereof is in the "alkyd resin field."

3. On the supposition, unacceptable of course to this court, that both of the above findings are incorrect, Ellis-Foster by long-continued acquiescence in the Cyanamid belief that it was licensed to produce Laminac, is estopped from questioning Cyanamid's right to proceed with its manufacture and sale especially in view of the large investment of Cyanamid in Laminac production.

4. The licensing of Cyanamid under the original agreement of 1936 was world-wide.

The foregoing shall constitute findings of fact and conclusions of law.

Submit appropriate order.