**AMERICAN CYANAMID COMPANY**

v.

**ELLIS-FOSTER COMPANY, Appellant.**

Nos. 13652, 13653.

United States Court of Appeals
Third Circuit.

Argued Dec. 7, 1961.

Decided Jan. 19, 1962.

William D. Burrows, New York City (William Rowe, Steelman, Lafferty, Rowe & McMahon, Newark, N. J. Albert C. Bickford, Simpson, Thacher & Bartlett, New York City, on the brief), for appellant.

John Hoxie, New York City (John D. McMaster, Jersey City, N. J., Davis, Hoxie, Faithfull & Hapgood, James E. Ryder, New York City, on the brief), for appellee.

Before GOODRICH, STALEY and GANEY, Circuit Judges.

GOODRICH, Circuit Judge.

American Cyanamid Company (Cyanamid) sued Ellis-Foster Company in the United States District Court for the District of New Jersey. The complaint sought a declaratory judgment that Cyanamid and its customers were licensed under Ellis-Foster's German patent 967,-265, and also sought an injunction and damages for attempts by Ellis-Foster to prevent the sale of products made in alleged infringement of the patent. Ellis-Foster in turn sued Cyanamid for infringement of Ellis-Foster's U. S. Patent 2,255,313, called the 313 patent. The cases were consolidated and tried together. Cyanamid won on all points in a judgment in accordance with a thoroughly considered opinion by Judge Meaney, 190 F.Supp. 277 (1960), and Ellis-Foster appeals. We agree with the trial judge and largely for the reasons given by him.

The background of the case is as follows. Beginning in 1928, Cyanamid and

Ellis-Foster were associated in a joint venture conducted through a company known as the Rezyl Corporation. Cyanamid owned seventy-five per cent of Rezyl's shares, Ellis-Foster twenty-five per cent. Cyanamid furnished the capital and manufactured and sold the products. Ellis-Foster did the research. In 1936 the venture ended. Cyanamid bought out Ellis-Foster's interest and existing agreements were terminated, being replaced by a license agreement. Since Article Second of the license agreement is the center of the present dispute, it is worth setting out verbatim. It says:

"ARTICLE SECOND

"Grant of Non-Exclusive License to CYANAMID

"A. ELLIS-FOSTER hereby grants unto CYANAMID (for itself and its subsidiaries), on the terms and conditions hereinafter set forth, a non-exclusive, royalty-free right and license to practise:

" * * *

"2. any inventions and/or discoveries in the alkyd resin field made during the period commencing October 5, 1928 and ending July 14, 1937, both dates inclusive, owned and/or controlled by ELLIS-FOSTER during such period, disclosed in any applications for Letters Patent or Letters Patent and/or any extensions or reissues thereof, irrespective of the date on which any such application shall have been filed or upon which any such patent shall have issued;

"3. any inventions and/or discoveries in the alkyd resin field made during the period commencing on October 5, 1928 and ending on July 14, 1937, both dates inclusive, owned and/or controlled by ELLIS-FOSTER during said period, whether said inventions and/or discoveries are patented or not. * * *"

About 1943, Cyanamid began to make a product called "Laminac," which it sold to customers whenever and wherever they could be found. One customer bought Laminac for making button blanks, which were sent to its Belgian subsidiary. The Belgian firm, in turn, sold the button blanks to a customer in Germany. This German customer was notified through German sources that in using these blanks it was infringing a German patent owned by Ellis-Foster. Two Ellis-Foster licensees said they had exclusive rights under the German patent. These license agreements gave the German firms the right to cancel the license without payment if their rights proved to be less than contracted for. Hence, this lawsuit.

It is a very noteworthy thing that ever since 1943 and until 1958 Cyanamid had been selling the product which is now claimed to be infringing Ellis-Foster's German patent. There is no doubt that this was done with the knowledge of Ellis-Foster and that no protest had ever been made. Ellis-Foster had prosecuted others for alleged infringement of the 313 patent. Indeed, in one of these cases, brought against the Pittsburgh Plate Glass Company and Lunn Laminates, Inc.,[1] counsel for Ellis-Foster stated: "When Lunn Laminates buys Laminac, that is licensed. We are not suing Lunn Laminates for having purchased Laminac from American Cyanamid. That is licensed." In the same case counsel for Ellis-Foster said: "We concede that any sales by American Cyanamid of its resinous materials which it sells under the trade name of Laminac carries with it the license * * *."

This was in 1955. In 1958 Ellis-Foster makes a complete turnabout and claims that Cyanamid is an infringer. This extraordinary performance was no doubt brought about by the German events just described. The district judge thought that this conduct amounted to an estoppel against Ellis-Foster. We hesitate to call it an estoppel in the strict sense. There was certainly an articulated representation made in the Pittsburgh Plate Glass case. But it was not

1. See Ellis-Foster Co. v. Pittsburgh Plate Glass Co., 132 F.Supp. 674 (E.D.N.Y.1955).

made to Cyanamid. Therefore, we do not have the orthodox estoppel situation where one party makes a representation to another and the other acts in reliance upon it. The party making the representation is not thereafter entitled to deny its truth. It may be that there was an estoppel by silence when Ellis-Foster kept still for fifteen years knowing that Cyanamid was making Laminac. But estoppel or not, this action of Ellis-Foster during this fifteen-year period is certainly a convincing demonstration of its interpretation of the contract. It is, of course, hornbook law that what the parties do under a contract is highly important in determining the meaning of the agreement which they have made. Restatement, CONTRACTS § 235(e); 3 CORBIN, CONTRACTS § 558 (rev. ed. 1960); 3 WILLISTON, CONTRACTS § 623 (rev. ed. 1936).

■ This case is full of technical terms in the field of industrial chemistry. The court asked one witness, Cadwell, to tell him what an alkyd is. The witness said: "It is the reaction product of an acid which has more than two carboxyl groups, two or more I should say, and a polyhydric alcohol which has two or more hydroxyl groups." The witness also said that alkyd and alkyd resin are synonymous for the purposes of discussion. There are many types of resins other than the alkyd group, such as urea resins, acrylate resins, melamine resins, and so on. For what it is worth, we quote the description of the alkyd resin field from the 1936 agreement. Here it is:

"A. ALKYD RESIN FIELD. The term 'alkyd resin field', as used in this Agreement, shall be deemed to mean the field of synthetic resins and synthetic balsams (synthetic balsams being herein defined as soft to liquid substances generally resembling balsams in respect of their physical properties), which synthetic resins and synthetic balsams are made from polybasic acids (and/or their anhydrides) and polyhydric alcohols with or without monobasic acids, fats and/or fatty oils as modifiers, and on coating compositions in

which such synthetic resins and/or synthetic balsams form an essential or dominating part."

An alkyd, as we understand it from the testimony, is the product of the reaction of an alcohol and an acid. The particular alcohol here involved is glycol and the acid is maleic acid. The resulting product is semi-liquid and sticky. Cyanamid produces Laminac from this type of resin by the addition of styrene, which was described by one witness, Kropa, as "a liquid monomeric unsaturated polymerizable compound containing an ethylenic linkage." Does this addition take the product out of the alkyd resin field licensed under the 1936 agreement?

There was expert testimony on this subject. We think the expert testimony is helpful in order that a court may understand the subject matter that the parties are arguing about. But what we have here is an interpretation of a contract. The technical terms used by chemists, while helpful, are not conclusive upon a court. The district judge concluded that the term "alkyd resin field," as used in the license contract, was not to be narrowly construed. We think that is right. After all, the 1936 agreement was the end result of eight years of association to which each party contributed. Ellis-Foster was to keep title to the patents; Cyanamid was given a nonexclusive license to practice them. So the district court concluded:

"That it [i. e., the term 'alkyd resin field'] is more extensive than a term which might refer solely to any esterified but uncopolymerized alkyd resin, is self-evident. To this court it would seem that the term 'alkyd resin field' indubitably includes all products, a necessary component of which in the course of their development is an alkyd resin."

We agree. And in agreeing we are taking the same position that Ellis-Foster took over a period of fifteen years.

■ Ellis-Foster seeks to limit the license granted in the 1936 document to

practice within the United States and it points to Article Third of the agreement as so limiting the license. Article Third reads:

"ARTICLE THIRD

"Prosecution of Patents

"CYANAMID shall have the primary responsibility of working and paying taxes under each of said foreign patents shown on said Exhibit A annexed hereto in respect of which it shall at the time be the sole licensee of ELLIS-FOSTER; but CYANAMID may at any time desist from making any further payment of taxes or conducting any required working in respect of any such foreign patent, provided it gives to ELLIS-FOSTER reasonable notice of its intention so to do in order to enable ELLIS-FOSTER, at its discretion, to maintain such patent at its own expense; and upon giving any such notice, all rights of CYANAMID and its subsidiaries hereunder under such patent shall forthwith cease and terminate.

"As to any future patents to be applied for in foreign countries on inventions covered by this Agreement, in the event that ELLIS-FOSTER does not proceed to apply for, or cause to be applied for on its behalf, in any foreign country, a patent on any invention and/or discovery covered by this Agreement, within ninety (90) days after receiving a written request from CYANAMID to do so, CYANAMID may apply for, or cause to be applied for, such patent in its own behalf and at its own expense and ELLIS-FOSTER shall (without expense to itself) fully cooperate with CYANAMID to such end; and in any such event CYANAMID shall be the sole owner of any Letters Patent that may be obtained on such application."

The district court made short work of this point concluding that the licensing of Cyanamid was worldwide. We agree. No territorial limitation was expressed in the granting article and to us it is clear that we should not read one into it. Article Third presupposes the granting of a license elsewhere.

■■ The final objection is that the court erred in appointing a special master to take an accounting of the full extent of appellant's breach and to recommend whether the acts of Ellis-Foster were such as to warrant exemplary damages. This latter suggestion evidently makes the appellant shiver, for it says exemplary damages are not granted for breach of contract. True, they usually are not. But nobody has said, up to now, that exemplary damages are to be awarded. We think the appellant is crying before he is hurt. The appointment of the master is, of course, a matter of discretion. See, e. g., Troyak v. Enos, 204 F.2d 536, 544–45 (7th Cir. 1953); BARRON & HOLTZOFF, FEDERAL PRACTICE & PROCEDURE § 1162, at 580–81 (Wright ed. 1961). We see no abuse of that discretion here.

The judgment of the district court will be affirmed with costs.