James TURNER, Plaintiff,

v.

JAPAN LINES, LTD., and Philippine President Lines, Inc., Manila, Defendants.

Civ. No. 75–727PA.

United States District Court, D. Oregon.

April 21, 1983.

Raymond J. Conboy, Portland, Or., for plaintiff.

John R. Brooke, Portland, Or., for defendant Philippine President Lines.

J.P. Graff, Portland, Or., for defendant Japan Lines, Ltd.

## OPINION AND ORDER

PANNER, District Judge.

The plaintiff is a longshoreman who was injured on June 13, 1974, when a defective stow collapsed aboard the vessel PRESIDENT QUEZON. He brought this diversity action against the vessel's owner, Philippine President Lines, Inc. (Philippine), and against the time-charterer, Japan Lines, Ltd. (Japan).

The parties consented to a jury trial before a magistrate, pursuant to the Magistrates Act[1] and the applicable local rule. On October 6, 1978, following a trial presided over by a magistrate, the jury returned a verdict for the plaintiff against both defendants. Defendants moved for judgment notwithstanding the verdict and the magistrate granted their motion. That order was approved and adopted by a district court judge. The Ninth Circuit reversed and remanded for reinstatement of the jury verdict. *Turner v. Japan Lines, Ltd.,* 651 F.2d 1300 (9th Cir.1981). On March 14, 1983, I entered judgment.

Japan now moves to set aside that judgment and for a new trial, on the ground that the judgment is void. Fed.R.Civ.P. 60(b)(4). I construe this motion as a challenge to the court's subject matter jurisdic-

1. 28 U.S.C. §§ 631–639.

tion, and will consider the merits of that challenge. *Id.; see* 7 J. Moore, *Moore's Federal Practice* § 60.25(2), (3).

In the alternative, Japan seeks relief from the appellate court's decision that it must indemnify Philippine. Japan also moves to set aside the judgment granting attorneys' fees to Philippine and for an injunction against enforcement of the judgment pending appellate review.

I DENY all four motions. In addition, I GRANT Philippine's petition for attorneys' fees.

## I. Subject Matter Jurisdiction

Japan contends that referral of this case to the magistrate was not authorized by the Magistrates Act, and violated Article III of the Constitution.[2] The thrust of its statutory argument is that referral of civil jury trials to magistrates was not authorized by Congress until 1979, while the referral in this case occurred in 1978. Its constitutional argument relies primarily on the Supreme Court's recent decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).[3]

### A. Statutory Authorization

When this case was referred to the magistrate, the Magistrates Act provided:

(b)(1) Notwithstanding any provision of law to the contrary—

(A) a judge may designate a magistrate to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dis-

miss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law.

(B) a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

(C) the magistrate shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.

Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

(2) A judge may designate a magistrate to serve as a special master pursuant to the applicable provisions of this

---

2. U.S. Const. art. III, § 1. *See* text *infra* p. 352.

3. The case arose when Marathon Pipe Line Company moved for, and was denied, dismissal of a contract claim brought against it in bankruptcy court by Northern Pipeline Construction Company. Marathon contended that bankruptcy judges were not Article III judges and that

the Bankruptcy Act purporting to give them jurisdiction over all cases relating to matters of bankruptcy violated Article III. Northern had petitioned the bankruptcy court for reorganization. The bankruptcy court denied Marathon's motion to dismiss; on appeal to the district court, the motion was granted. The Supreme Court affirmed the dismissal.

title and the Federal Rules of Civil Procedure for the United States district courts. A judge may designate a magistrate to serve as a special master in any civil case, upon consent of the parties, without regard to the provisions of rule 53(b) of the Federal Rules of Civil Procedure for the United States district courts.

(3) A magistrate may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States.

(4) Each district court shall establish rules pursuant to which the magistrates shall discharge their duties.

28 U.S.C. § 636(b) (1976).

In 1977, relying on the "additional duties" provision of 28 U.S.C. § 636(b)(3), the District of Oregon promulgated Local Rule 5, which provided:

Where the parties consent, the United States Magistrates assigned in Portland and Eugene are authorized to try any civil case without further order of the court. In all such cases the clerk is directed to enter judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

L.R. 5 (1977) (superceded by L.R. 135–1(c) (1982)).

This rule was based on a broad interpretation of the statutory language:

The District of Oregon has interpreted the Magistrates Act broadly. We interpret the Act to authorize us to refer to magistrates the trial of any civil case—jury or non-jury—with the consent of the parties. We infer this authority not from the special master provision but from the "additional duties" section of the Act, 28 U.S.C. § 636(b)(3).

*Hearings Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 96th Cong., 1st Sess. 16 (1979) (statement of the Hon. Otto R. Skopil, then Chief Judge, District of Oregon).

In 1979, Congress approved the District of Oregon's broad interpretation by adding a new provision to the Magistrates Act. *See* Federal Magistrates Act of 1979, Pub.L.

No. 96–82, 93 Stat. 643 (1979) (codified at 28 U.S.C. § 636(c)). This amendment provides in part:

Upon the consent of the parties, a full-time United States magistrate or a part-time United States magistrate who serves as a full-time judicial officer may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or court he serves.

28 U.S.C. § 636(c)(1).

■ Japan argues that since the subsequent provision was "new," Congress could not have intended the "additional duties" language of the earlier statute to encompass the referral of civil jury cases for trial before a magistrate. This argument is disposed of in *Coolidge v. Schooner California,* 637 F.2d 1321, 1323–25 (9th Cir.) *cert. denied,* 451 U.S. 1020, 101 S.Ct. 3011, 69 L.Ed.2d 392 (1981). In that decision the Ninth Circuit declined to hold that referral of civil jury cases for trial before a magistrate was beyond the authority conferred by the "additional duties" language at 28 U.S.C. § 636(b)(3). (The case had been tried before an Oregon magistrate prior to the 1979 amendment to the Magistrates Act.) The court noted that the legislative history supported a broad reading of congressional intent "to encourage innovative experimentation in the use of magistrates." *Id.* at 1325. Japan's argument that referral to the magistrate was not authorized by the statute is without merit.

## B.  Article III

Japan contends that referral of civil jury cases to a magistrate for trial violates Article III of the Constitution. Judicial review of the constitutionality of a statute begins with examination of the textual constitutional premises against which the statute is to be tested. *See* Linde, *Without "Due Process,"* 49 Or.L.Rev. 125, 131 (1970). *See also* J. Ely, *Democracy and Distrust,* 16–18 (1980).

Article III is part of the constitutional blueprint for distribution of the limited power given our federal government. Article III provides in part:

Section 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

Article III grants authority to Congress to confer jurisdiction in the separately identified subject matter areas of section two. Section one, and the case and controversy requirement of section two, are further limitations on congressional authority to create federal court jurisdiction. *See* C. Wright, *Law of Federal Courts* § 12 (3d ed. 1976). Congress may confer less than all of the jurisdiction authorized by Article III, and may limit the jurisdiction that it confers. (For example, diversity jurisdiction is limited by the amount-in-controversy requirement. 28 U.S.C. § 1332.)

Section one of Article III was recently interpreted by the Supreme Court in *Marathon.*

The "good Behaviour" Clause guarantees that Art. III judges shall enjoy life tenure, subject only to removal by impeachment. The Compensation Clause guarantees Art. III judges a fixed and irreducible compensation for their services. Both of these provisions were incorporated into the Constitution to ensure the independence of the judiciary from the control of the executive and legislative branches of government .... In sum, our Constitution unambiguously enunciates a fundamental principle—that the "judicial Power of the United States" must be reposed in an independent Judiciary. It commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence.

*Marathon,* 102 S.Ct. at 2858 (citations and footnotes omitted).

The primary purpose of Article III is to maintain the structural integrity of the federal judicial branch in relation to the executive and legislative branches.

The Constitution, in distributing the powers of government, creates three distinct and separate departments—the legislative, the executive, and the judicial. This separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital, namely to preclude a commingling of these essentially different powers of government in the same hands.

. . . .

If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to the coercive influence of either of the other departments.

*O'Donoghue v. United States,* 289 U.S. 516, 530, 53 S.Ct. 740, 743, 77 L.Ed. 1356 (1932) (Article III prohibits Congress from reducing the salaries of Article III judges in the District of Columbia). Article III reflects "the anxiety of the framers of the Constitution to preserve the independence especially of the judicial department." *Id.* at 531, 53 S.Ct. at 743.

The drafters of Article III believed that separation of powers together with the checks and balances of the federal government was a "self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley v. Valeo,* 424 U.S. 1, 122, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976). They believed that in protecting the structural integrity of the judiciary, they ensured, in the best possible way, that the judiciary would be impartial. Hamilton articulated this belief when he opposed passage of a federal bill of rights.

> [A] bill of rights, in the sense and to the extent in which they are contended for, are not only unnecessary in the proposed Constitution, but would even be dangerous. They would contain various exceptions to powers not granted; and, on this very account, would afford a colorable pretext to claim more than were granted. For why declare that things shall not be done which there is no power to do?
>
> . . . .
>
> The truth is, after all the declamations we have heard, that the Constitution is itself, in every rational sense, and to every useful purpose, a BILL OF RIGHTS.

The Federalist No. 84, at 156–57 (A. Hamilton) (E. Bourne ed. 1901).

■ The plaintiff opposes this motion partly because he contends that Japan waived any right to object to constitutional infirmities. Parties have the right to waive access to a judge, and to agree to have their dispute resolved in another forum. *DeCosta v. Columbia Broadcasting System, Inc.,* 520 F.2d 499 (1st Cir.), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976) (analogizing consent to proceedings before a magistrate to consent to arbitration). The plaintiff's waiver argument would be persuasive had Japan based this motion on an alleged violation of its rights under the fifth amendment due process clause. But the plaintiff's focus on procedure is misleading, and illustrates both the difficulty and the importance of separately analyzing Article III and due process issues.

Due process and separation of powers doctrines are closely related. Both require that the judiciary provide an independent and impartial forum to adjudicate Article III cases. Their focus is somewhat different, however. While due process concentrates on the individual claimant's interest in obtaining an impartial adjudication of his or her claim, separation of powers focuses on the interest of the judicial forum itself in maintaining its position as a distinct and independent branch of government. In many cases both a due process and a separation of powers analysis of congressional action will reach the same result. However, the doctrines are not entirely coterminous.

Anything contained in the body of the Constitution is, of course, superseded by any conflicting amendment adopted after the establishment of the Constitution itself. Thus, it has been correctly argued that to the extent that the provisions of Article III are inconsistent with the due process clause of the fifth amendment, those provisions of Article III must be considered modified by the amendment . . . .

There is disagreement, however, about how the due process clause affects Congress' Article III power.

M. Redish, *Federal Jurisdiction: Tensions in the Allocation of Judicial Power* 24–25 (1980).

It is logical to examine a statute under Article III before deciding whether due process restrictions modify Article III's requirements.[4] In order to keep Article III

---

4. For a thoughtful discussion of the possible effects of the due process clause on Article III

in a variety of situations involving congression-

analysis from slipping into due process issues, the structural nature of Article III should be kept in mind. Although both Article III and the due process clause serve the same end—to provide an impartial judiciary—they employ different means.

Having examined the textual constitutional premises, I turn to the defendant's contention that *Marathon* provides a conceptual framework for testing and invalidating the Magistrates Act. Defendant's Memorandum at 14.

In *Marathon,* section 241(a) of the Bankruptcy Reform Act[5] did not survive an Article III challenge. The array of opinions[6] in *Marathon* reflects the difficulty with which members of the Court arrived at the conclusion that Congress had, in enacting the Bankruptcy Reform Act, attempted to displace the judicial power of the United States from Article III judges to non-Article III judges. However, a majority of the justices agreed that Congress went too far in attempting to confer on the bankruptcy courts subject matter jurisdiction that included both traditional bankruptcy matters and all matters "arising in or related to cases arising under title 11," 28 U.S.C. § 1471(b) (1976 & Supp. III). Technically, the Act gave jurisdiction to the district courts, but that assignment was accompanied by a provision that the bankruptcy courts would exercise "all of the jurisdiction" of the district courts. The *Marathon* plurality commented on the technical assignment of jurisdiction to the district court: "In short, the 'adjunct' bankruptcy courts created by the Act exercise jurisdiction behind the facade of a grant to the district courts." 102 S.Ct. at 2879.

At the heart of the plurality's conclusion was the thought that if Congress could provide for bankruptcy and "related matters" to be adjudicated by judges "within Congress' exclusive control," then it would be difficult to protect "against the erosion of Art. III jurisdiction by the unilateral action of the political branches." *Id.* To accept the broad jurisdictional assignment to the bankruptcy courts "would require that we replace the principles delineated in our precedents, rooted in history and the Constitution, with a rule of broad legislative discretion that could effectively eviscerate the constitutional guarantee of an independent Judicial Branch of the Federal Government." *Id.*

In *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), and in *United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), the Court approved the use of administrative agencies and magistrates as "adjuncts" to Article III courts. In a footnote in *Marathon,* the plurality observed that "Congress' power to create adjuncts and assign them limited adjudicatory functions is in no sense an 'exception' to Art. III, rather, such an assignment is consistent with Art. III, so long as 'the essential attributes of judicial power' are retained in the Art. III court . . . ." *Marathon,* 102 S.Ct. at 2874 n. 29. The Court in *Crowell* and *Raddatz* permitted the delegation of adjudicatory functions because Article III courts had the power to adjudicate the private rights in both situations. The point is not that Article III courts actually adjudicated the rights; the point is that the decision to enforce or to set aside the administrative findings in *Crowell,* or the decision to accept or reject the magistrate's findings in *Raddatz,* was within their power.

■ Article III, its history, and the cases construing it, lead me to conclude that Congress violates Article III when: (1) it enacts a statute that vests the federal judi-

---

al limitation or regulation of federal jurisdiction, See M. Redish, *Federal Jurisdiction: Tensions in the Allocation of Judicial Power,* 24–29 (1980).

**5.** 28 U.S.C. § 1471 (1976 & Supp. III).

**6.** The plurality opinion was written by Justice Brennan, and joined by Justices Marshall, Blackmun, and Stevens. Justices Rehnquist and O'Connor joined in a concurring opinion, agreeing that the Act went too far, but declining to join in the plurality's explanation of why it did. Chief Justice Burger dissented in his own opinion and joined in a dissenting opinion written by Justice White. Justice Powell joined Justice White's dissent.

cial power in non-Article III courts, and (2) the Supreme Court has not determined that it is within an area of law that non-Article III courts may adjudicate. I conclude, for reasons stated below, that the Magistrates Act did not vest the federal judicial power in magistrates, and consequently, that the Act is constitutional under Article III.

The Magistrates Act was passed after years of congressional study; in it Congress "sought to 'reform the first echelon of the Federal judiciary by establishing a system of U.S. Magistrates.'" *Mathews v. Weber,* 423 U.S. 261, 266, 96 S.Ct. 549, 552, 46 L.Ed.2d 483 (1975) (quoting S.Rep. No. 371, 90th Cong., 1st Sess. 8 (1967)). Magistrates were approved by Congress for use by district courts—at the discretion of the district courts—in civil and criminal matters. "In enacting this section [section 636(b)] and in expanding the criminal jurisdiction conferred upon magistrates, Congress hoped by 'increasing the scope of the responsibilities that can be discharged by that office, . . . to establish a system capable of increasing overall efficiency of the Federal judiciary . . .'" *Id.* at 268, 96 S.Ct. at 553 (quoting S.Rep. No. 371, 90th Cong., 1st Sess. 11 (1967)).

In practice, the Magistrates Act accomplished the congressional intent to facilitate adjudication by the federal judiciary. Magistrates are employed to assist district court judges with what Congress recognized as an "avalanche of additional work for the district courts" resulting from the enactment of many new statutes and regulations. *Mathews,* 423 U.S. at 268, 96 S.Ct. at 553. The auxiliary nature of the magistrate system is dramatically evident when the practical consequences of invalidating the Act are considered. Not only would over-burdened district courts be compelled to try civil cases in which parties have consented to a magistrate, but numerous criminal misdemeanor trials now frequently held before magistrates would have to be heard by district court judges. *See* 18 U.S.C. § 3401. The crowding of court dockets and the inconvenience to litigants that are predictable indicate the valuable support that district courts receive from magistrates. Practical considerations do not validate an otherwise unconstitutional statute, of course. But the practical consequences of removing the magistrate system help clarify the point that the magistrates are assistants to the district courts.

The Magistrates Act did not (and does not) contain mandatory language. Under the Act district courts decide which judicial functions will be delegated to magistrates. Control of the use of magistrates belongs to district court judges; consequently, the judicial power remains with the district courts.

As Justice Blackmun observed in *United States v. Raddatz:*

Moreover, the magistrate himself is subject to the Art. III judge's control. Magistrates are appointed by district judges, § 631(a), and subject to removal by them, § 631(h). In addition, district judges retain plenary authority over when, what, and how many pretrial and trial matters are assigned to magistrates, and "each district court shall establish rules pursuant to which the magistrates shall discharge their duties." § 636(b)(4). Thus, the only conceivable danger of a "threat" to the "independence" of the magistrate comes from within, rather than without, the judicial department . . . . Even assuming that, despite these protections, a controversial matter might be delegated to a magistrate who is susceptible to outside pressures, the district judge—insulated by life tenure and irreducible salary—is waiting in the wings, fully able to correct errors. Under these circumstances, I simply do not perceive the threat to the judicial power or the independence of judicial decisionmaking that underlies Art. III. We do not face a procedure under which "Congress [has] delegated to a non-Art. III judge the authority to make final determinations on issues of fact." . . . . *Rather we confront a procedure under which Congress has vested in Art. III judges the discretionary power to delegate certain functions to competent and impartial assist-*

*ants, while ensuring that the judges retain complete supervisory control over the assistants' activities.*

447 U.S. at 685–86, 100 S.Ct. at 2417 (concurring opinion, quoted with approval in *Marathon,* 102 S.Ct. at 2875 n. 30 (emphasis added)).

The primary goal of Article III, to maintain the structural integrity of the judicial branch in relation to the other two branches, is not threatened by the Magistrates Act. The independence of the district court Article III judges encompasses the magistrates as well. Further, the Act's provisions contrast radically with the bankruptcy provisions found to undermine Article III in *Marathon.*

The Bankruptcy Reform Act provided that bankruptcy judges would be appointed by the President, with the advice and consent of the Senate. 28 U.S.C. §§ 152, 153(a). Magistrates are appointed by district court judges. 28 U.S.C. § 631(a). Congress fixed the bankruptcy judges' salaries, which were adjustable under the Federal Salary Act, 2 U.S.C. §§ 351–361. 28 U.S.C. § 154 (1976 ed. & Supp. III). Magistrates' salaries are fixed by the Judicial Conference of the United States, 28 U.S.C. § 633.

The crucial difference between the Bankruptcy Reform Act and the Magistrates Act is this: under the Bankruptcy Reform Act, an Article III judge could not prevent cases "related to" bankruptcy matters from being tried before non-Article III judges. Under the Magistrates Act, district court judges exercise complete control over the magistrates' cases. If district court judges want only a particular class of cases, or no cases, tried before magistrates, they adopt a local rule implementing their decision.

I conclude that Article III courts were not deprived of "the essential attributes of judicial power" by the Magistrates Act. Article III does not invalidate the statutory authority under which the parties' trial was referred to the magistrate. I DENY Japan's motion for relief from judgment.

## II. Indemnity

■ Japan asks that I relieve it of the Ninth Circuit's decision that it must indemnify Philippine for the damages the latter defendant must pay to the plaintiff. The basis for Japan's request is that the Ninth Circuit had no jurisdiction to make that determination because the original referral to the magistrate was constitutionally faulty, and that all subsequent decisions are void. I rejected Japan's jurisdictional argument made in support of its first motion; I reject the extension of that argument here. In addition, I note that Japan asked the Ninth Circuit to rehear the case for arguments regarding indemnity, and that the appellate court declined to do so. Japan included indemnity as an issue in its petition for certiorari filed with the Supreme Court, and that petition was denied.

I DENY Japan's second motion.

## III. Attorneys' Fees

■ In the judgment entered March 14, 1983, I ordered that Philippine have judgment against Japan for any amount Philippine may be required to pay to the plaintiff, plus attorneys' fees and costs incurred by Philippine in the defense of the plaintiff's lawsuit. Japan's third motion asks that I set aside the attorneys' fees ruling.

The judgment did not specify an amount of attorneys' fees to be awarded. Philippine has petitioned for the award of $42,500 in attorneys' fees and $2,698.34 in costs. At oral argument on the motion, Japan's counsel indicated that Japan does not contest the amount of fees and costs sought, but rather that any should be awarded at all. I find that $42,500 and $2,698.34 in fees and costs respectively are sums reasonably expended by Philippine in the defense of this case.

Japan points out that the Ninth Circuit's decision did not address the question of attorneys' fees. However, I conclude that the appellate court's decision, that Philippine was entitled to indemnity as a matter of law, extends not only to the damages Philippine is required to pay to the plaintiff but also to the fees and costs incurred by Philippine in defending the case. *Cf.* Fed.

R.Civ.P. 54(c) (every final judgment shall grant the relief to which the party is entitled).

I GRANT Philippine's petition for attorneys' fees and costs and DENY Japan's third motion.

### IV. Injunction

Finally, Japan asks that I enjoin enforcement of the March 14, 1983, judgment pending final appellate resolution of the issues raised here. Japan can seek such a stay from the appellate court. To allow it an opportunity to do so, I continue the injunction until five days following the filing of this opinion. Other than that, I DENY Japan's fourth motion.

IT IS SO ORDERED.