UNITED STATES of America, Plaintiff,

v.

CONSERVATION CHEMICAL COMPANY, Norman B. Hjersted, Conservation Chemical Co. of Illinois, Armco Steel Corporation, FMC Corporation, International Business Machines Corp., Western Electric Company, Inc., Mobay Chemical, Defendants.

No. 82–0983–CV–W–5.

United States District Court, W.D. Missouri, C.D.

May 1, 1985.

Kenneth Josephson, Ken Weinfurt, Asst. U.S. Attys., Kansas City, Mo., John R. Barker, Environmental Enforcement Sec., John Wittenborn, Environmental Defense Sec., Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Niewald, Waldeck, Norris & Brown, Michael E. Waldeck, John L. Hayob, Terry L. Karnaze, Linde Thomson Fairchild Langworthy Kohn, John R. Cleary, Darwin Johnson, Wm. Session and Robert J. Bjerg, Kansas City, Mo., for Conservation Chemical, CCC of Ill. and Norman Hjersted.

Thos. F. Fisher, John M. Kilroy, Jr., Shughart, Thomson & Kilroy, Kansas City, Mo., Edmund B. Frost, John A. Zackrison, Kirkland & Ellis, Washington, D.C., Robert F. St. Aubin, Philadelphia, Pa., for FMC Corp.

J. Jeffrey McNealy, Porter, Wright, Morris & Arthur, Columbus, Ohio, Martin J. Purcell, Robert M. Kroenert, Stanley A. Reigel, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., Daniel W. Kemp, Middleton, Ohio, for Armco, Inc.

Jerome T. Wolf, Carl H. Helmstetter, Spencer, Fane, Britt & Browne, Kansas City, Mo., John A. McKinney, Morton I. Zeidman, Alan R. Chesler, New York City, for AT & T Tech. Inc.

Richard F. Adams, Ben R. Swank, Jr., John J. Williams, III, Slagle & Bernard, Kansas City, Mo., for Third Party plaintiffs.

Stephen Jacobson, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., for Mobay.

Neil D. Williams, Overland Park, Kan., James F. Duncan, Watson, Ess, Marshall & Enggas, Kansas City, Mo., Allan J. Topol, Patricia A. Barald, David F. Will, Covington & Burling, Washington, D.C., J. Jeffery McNealey, Porter, Wright, Morris & Arthur, Columbus, Ohio, for IBM Corp.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

On July 20, 1984, the Court entered an order of reference pursuant to Fed.R.Civ.P. 53 appointing Robert H. Freilich to serve as Special Master. In addition to duties involving supervision of discovery and pretrial management, the Court authorized the Master to hold a hearing on claims for inclusion in any injunctive relief order and to prepare a Report and Recommendation on the issues presented. On the same date, the hearing was set to commence on February 18, 1985. Because of continuances necessitated by the parties, the hearing was rescheduled to commence on May 28, 1985 by Recommendation filed February 11, 1985.

Nine months after the filing of the Order of Reference, and on the eve of the injunctive relief hearing, a joint motion was filed on April 17, 1985 by original generator defendants and third-party plaintiffs Armco, Inc., AT & T Technologies, Inc., IBM Corporation, and FMC Corporation, seeking the revocation of the "Special Master's authority to conduct the trial on major issues." The generator defendants contend that no exceptional circumstances exist within the meaning of Rule 53 warranting the Master's authority to hold a hearing on the claim for injunctive relief and related third-party claims. In addition, the generator defendants argue that the Master's participation in the hearing would deprive them of their right to trial by a judge sitting pursuant to Article III of the Constitution. A number of third-party generator defendants have joined in this motion or have filed similar motions.

## I. BACKGROUND

### A. *Factual and Procedural Posture*

The United States Government initiated this environmental litigation pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and the Resource Conservation and Recovery Act (RCRA). The Government requests mandatory injunctive relief pursuant to 42 U.S.C. § 9606(a) and 42 U.S.C. § 6973(a), and seeks a Court-ordered clean-up of a chemical waste disposal site operated by the Conservation Chemical Company. Injunctive relief is authorized under § 9606(a) when there is "an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance...." In addition to the site operator, the defendants named in the Government's complaint are the original generator defendants IBM, ARMCO, FMC and AT & T Technologies.

The Government has alleged that the disposal site has a surface area of nearly six acres and contains approximately 2,500,000 cubic feet of waste. The Conservation Chemical Company disposal site lies in the flood plain of the Missouri River, approximately 150 yards from the river bank. The site allegedly is about 200 yards from the confluence of the Missouri and Blue Rivers. The Government claims that the soil surrounding the disposal site consists of highly permeable deposits of sand, clay and silt, and that the groundwater below the silt is hydrologically connected with the Missouri and Blue Rivers. These circumstances, according to the Government's allegations, present the possibility of extensive contamination.

As noted in this Court's order of reference, the Government contends that the following chemicals, all suspected to be carcinogenic, have been found in the groundwater at the site: arsenic, tricholoroethylene, benzene, dichloroethylene, vinyl chloride, chloromethane, dichloroethane, and trichloroethane. The Government claims that the following hazardous substances have migrated from the site: barium, cad-

mium, chromium, mercury, nickel, phenol, copper cyanide, ethyl benzene, lead and zinc. The Government contends that these chemicals have migrated from the site and have contaminated the groundwater under the site and underlying the adjoining property. The Government also claims that these chemicals are likely to enter the Missouri and Blue Rivers, thereby threatening communities downriver which use the Missouri River for crop irrigation, livestock watering and recreation, as well as threatening aquatic and wildlife habitats. The Government notes that the Missouri River is used as an industrial water supply and for human consumption. There also have been allegations that chemical wastes from the site penetrate the watertable to the extent that hazardous substances flow under the riverbeds north of the Missouri River and present a more immediate threat to nearby populated areas, including endangerment of well fields used by the cities of Independence and Liberty, Missouri, which serve a population of several hundred thousand persons.

Following the Court's determination that the original defendants were subject to joint and several liability under CERCLA,[1] the generator defendants brought third-party complaints in June, 1984, against 154 private third-party defendant generators, seeking to include the third-parties in any injunctive order and to obtain an apportionment of the cost of any remedy. In addition, the generator defendants brought similar third-party claims against 14 governmental third-party defendant generators,[2] and against 16 insurance companies. Third-party claims also were brought by the generator defendants against two companies which occupy land adjacent to the disposal site on the theory that the companies contributed to the hazard by allowing chemical migration onto the waste disposal site. The site operator brought a third-party complaint against 17 insurance companies. A second phase of impleader in Octo-ber, 1984, brought in approximately 75 additional third-party generator defendants. As a result, this litigation has involved over 250 parties.

In addition to the Government's initial allegations concerning the presence of hazardous chemicals, the remedial investigation recently conducted by the generator defendants produced a sampling analysis of the disposal site revealing the presence of dioxin. This development subsequently was reported in a press release issued by the Environmental Protection Agency. The Environmental Protection Agency has recently initiated efforts to have the Conservation Chemical disposal site placed on the National Priorities List.

By pretrial order of July 20, 1984, the parties were advised that this litigation would be bifurcated into two phases. The bifurcation has been refined by a recommendation of the Special Master which has been approved by the Court. Phase I issues include the Government's request for injunctive relief, requiring a determination regarding whether an imminent and substantial endangerment exists, whether any of the defendants are responsible for the endangerment, and the scope of the remedial order, if any. Phase I litigation also resolves whether any of the third-party generators should be included in the injunctive order or held responsible for monetary contribution to the third-party plaintiffs, and limited insurance questions concerning the liability of the insurer of the insolvent Conservation Chemical Company. Phase II will resolve issues of financial apportionment among the parties, liability for response costs, the remaining insurance questions and peripheral issues.

Because the Court believed that the allegations involved serious threats to the public health and safety and to the environment, the Court directed that discovery in Phase I be expedited and substantially reduced the time sought by the Government to prepare its case. By order of July 20,

---

1. *See United States v. Conservation Chemical Co.,* 589 F.Supp. 59 (W.D.Mo.1984).

2. As a result of subsequent motion practice, these claims are now in the form of counterclaims against the plaintiff.

1984, discovery was to be complete on Phase I issues by November 2, 1984, and the hearing on Phase I issues was set to commence before the Master on February 18, 1985. By virtue of requests by all parties, including the third-party plaintiffs, for continuances to allow for more discovery and to explore the possibility of settlement, the hearing was rescheduled three times and is now set to commence on May 28, 1985. It has been estimated by the parties that the hearing on Phase I issues alone will last from six months to one year.

During the course of the Master's supervision of the discovery concerning Phase I issues, the generator defendants undertook a comprehensive remedial investigation and feasibility study in order to determine the nature of the conditions at the disposal site and to analyze various remedial action alternatives. Although the generator defendants' report suggested that only limited remedial action was required, it nonetheless identified several separate remedial alternatives and estimated the cost of each remedy as follows: monitoring the site—$210,000; establishment of surface barriers—$660,000; monitoring with a multilayered cover—$2.3 million; establishment of a multi-layered cover with a cutoff wall—$6.1 million; creation of a multi-layered cover with a slurry cutoff wall with groundwater pumping—$18.3 million; excavation and stabilization of material—$15.7 million; excavation and removal of material by truck—$75.5 million; and excavation and removal of material by barge—$44.6 million. *See* Feasibility Study on the Conservation Chemical Company site at Table 1–1. The generator defendants recommended implementation of the surface barrier, a selection which reflects their determination that there is no present groundwater contamination. The Government, on the other hand, has concluded that not only is the groundwater at the site contaminated, but that the surrounding aquifer

has been contaminated and that contaminants are migrating into and under the Missouri River, thereby threatening the groundwater on the other side of the River which serves as a source of urban water supply. Therefore, the Government's view is that a significantly different and more costly approach is needed to remedy the site. *See* Government's Endangerment Assessment and Draft Feasibility Study.

**B. The Order of Reference and the Present Motions**

On July 20, 1984, the Court entered its order of reference appointing the Special Master. Included within the scope of the Master's authority was the power to order and preside over pretrial hearings, the authority to supervise and issue recommendations regarding pretrial matters, and the authority to hold hearings and issue recommendations on the claims for inclusion in any injunctive relief order and apportionment of costs. In so doing, the Court expressly reserved its judicial authority and responsibility to make the ultimate determination on all issues. The order provided for the Court's independent review of the Master's Recommendations after the parties had the opportunity to object, comment or respond to the recommendation.

With respect to the Master's authority to hold hearings on the injunctive claims and cost apportionment, the Court provided that "the Master will prepare a report upon the matters submitted to him and shall make recommended findings of fact and conclusions of law. The Master's Report shall be filed with the Clerk of the Court, and the Master shall file with it a transcript of the proceedings and evidence and the original exhibits. A similar report shall be prepared with respect to the claims for apportionment of costs. If it is determined that the apportionment claims require a jury trial, the use of the Master's findings will be governed by Federal Rule of Civil Procedure 53(e)(3) and relevant case law.[3]

---

**3.** The Court notes that the issue of whether the parties are entitled to jury trial was the subject of motion practice and has been argued before the Master. The Master has recommended that

the parties are not entitled to a jury on any Phase I issue. The Court has reviewed the recommendation and reaches the same conclusion. Thus, Phase I will involve only non-jury issues.

... Regarding the Master's recommended findings of fact and conclusions of law, any party may file objections, responses or comments thereto within ten (10) days of the date of the filing of the recommendation. ... The Court will independently review the Master's proposed findings of fact and conclusions of law, and, after a hearing the Court may adopt the report or modify it, reject it in whole or in part, may receive further evidence or recommit the report with instructions." Order of Reference at 11–12.

In appointing the Master, the Court found that exceptional circumstances existed within the meaning of Rule 53 because of a combination of factors. Primarily, the Court believed that the assistance of a Master was warranted because of the need for a prompt resolution of serious claims alleging an imminent and substantial endangerment to the public health and welfare and to the environment. In addition, the Court noted that the determination of complex factual issues relevant to liability and cost apportionment would require a comprehensive analysis of voluminous technical and scientific data. The Court also noted that the issues involved in this case were further complicated by the number of parties, the allegations of commingling of waste, and the absence of accurate documentation of chemical deposits because many of the disposal site's business records have been destroyed. In addition, the Court believed that a Master's participation was warranted because the vast amount of evidence necessary to litigate this case would result in extensive discovery requiring nearly constant supervision.

On April 17, 1985, the generator defendants filed a motion requesting that the Court revoke the Master's authority to conduct the hearing and to issue a Report and Recommendation on Phase I issues. In support of its motion, the generator defendants argue that the Master's authority should be revoked because of "recent events in the case" and "in view of circumstances that have occurred since the order of reference was entered." Generator defendants' motion to revoke at 1 & 6. The generator defendants contend that there is no necessity for a prompt resolution of the issues because the disposal site presents no immediate threat to the public, and that therefore the public interest is not a factor relevant to the existence of an exceptional circumstance under Rule 53. In addition, the generator defendants contend that "there is nothing unique or unusual about this case," and that it is "no different than any garden variety CERCLA case." Generator defendants' motion to revoke at 7 & 9. In addition, the defendants claim that the Master's participation will delay rather than expedite the resolution of this case. Finally, the generator defendants contend that the Special Master's authority will deprive them of their right to trial by an Article III judge.[4] These contentions are reiterated in similar motions filed by various third-party defendants. The generator defendants request a prompt ruling on their motion so that mandamus relief may be sought.

## II. EXCEPTIONAL CIRCUMSTANCES UNDER RULE 53

### A. Legal Standards

Federal Rule of Civil Procedure 53(b) provides for the appointment of a Special Master in a non-jury action "on a showing that some exceptional condition requires it." The generator defendants argue that exceptional circumstances within the meaning of Rule 53 do not exist in this litigation under the standards set forth in *LaBuy v.*

---

**4.** It should be emphasized that the generator defendants' motion does not challenge the propriety of the appointment of the Master to issue recommendations on pretrial issues and discovery matters as well as certain aspects of dispositive issues: "Thus, in this case, the Master is appropriately used to supervise discovery, and there may be accounting and computational issues that the Master could handle in the first instance." Generator defendants' motion to revoke at 6. Similarly, the Government has expressed its position that the Master may properly perform a number of functions vital to this litigation. *See* Response of the United States to defendants' motion to revoke at 2–3. Therefore, the present issue does not involve the complete scope of the Master's authority, but only his authority to hear and report on Phase I issues.

*Howes Leather Company,* 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957) and *Liptak v. United States,* 748 F.2d 1254 (8th Cir. 1984). In *LaBuy,* the Supreme Court held that a trial court abused its discretion in appointing a Special Master to preside over a six-week antitrust trial. The Supreme Court stated that neither calendar congestion, complexity of issues, nor the possibility of a lengthy trial were exceptional conditions under Rule 53. *LaBuy,* 77 S.Ct. at 313–15. In *Liptak,* the trial court appointed a Special Master to resolve a *pro se* taxpayer suit against the government in which preliminary injunctive relief was sought. In reversing the reference order, the Eighth Circuit concluded that no exceptional condition had been shown justifying the reference, and that the standards set forth in *LaBuy* had not been satisfied.

The generator defendants argue that as a result of the *LaBuy* decision, it is "virtually never proper to refer an entire trial to a Master." Generator defendants' motion to revoke Special Master's authority at 3. Initially, the Court is compelled to note that this statement is a mischaracterization of the circumstances at hand. In its order appointing the Master, the Court did not "refer the entire trial" of Phase I to the Master, but instead made it clear that the ultimate resolution of all issues raised at the Phase I hearing would be determined by the Court. In the order of reference, it was specifically provided that "the Court will independently review the Master's proposed findings of fact and conclusions of law and, after a hearing the Court may adopt the report or modify it, reject it in whole or in part, may receive further evidence or recommit the report with instructions." Order of reference at 12. Because the Court has reserved final authority in this case, the contention that the Court has delegated the "entire trial" to the Master is inaccurate.

Moreover, several cases decided subsequent to *LaBuy* indicate that the trial court's authority to appoint special masters is not as limited as the generator defendants suggest. The United States Supreme Court, exercising its original jurisdiction to resolve governmental boundary disputes pursuant to Art. III § 2 of the Constitution, regularly appoints special masters to hold and conduct hearings and to submit comprehensive recommendations resolving contested issues. *See United States v. Louisiana,* ——— U.S. ———, 105 S.Ct. 1074, 84 L.Ed.2d 73 (1985); *United States v. Maine,* ——— U.S. ———, 105 S.Ct. 992, 83 L.Ed.2d 998 (1985); *Oklahoma v. Arkansas,* ——— U.S. ———, 105 S.Ct. 770, 83 L.Ed.2d 768 (1985); *United States v. South Carolina,* ——— U.S. ———, 104 S.Ct. 3582, 82 L.Ed.2d 880 (1984); *Texas v. New Mexico,* ——— U.S. ———, 104 S.Ct. 1410, 79 L.Ed.2d 737 (1984); *Colorado v. New Mexico,* ——— U.S. ———, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984). Similar to the procedure outlined in the order of reference in the instant case, the Supreme Court independently reviews the record and evaluates the Master's report in light of the exceptions presented by the parties. *See, e.g., United States v. Louisiana,* 105 S.Ct. at 1080–87. In addition to boundary disputes, the Supreme Court also has utilized the assistance of a Special Master to supervise motion practice and hold evidentiary hearings to resolve a tax dispute regarding the estate of billionaire Howard Hughes. *See California v. Texas,* 459 U.S. 963, 103 S.Ct. 288, 74 L.Ed.2d 274 (1982).

■■■■■ The authority of lower courts to appoint special masters in a variety of contexts is well-established in post-*LaBuy* decisions. Generally, reference to a Special Master lies within the discretion of the District Court. *Southern Agency Co. v. LaSalle Casualty Co.,* 393 F.2d 907, 914 (8th Cir.1968); *Harrington v. Sorelle,* 313 F.2d 10, 13 (10th Cir.1963); *American Cyanamid Corp. v. Ellis Foster Co.,* 298 F.2d 244, 247 (3d Cir.1962). Where accounting problems are involved, the District Court has broad discretion to appoint a Master. *Southern Agency Co.,* 393 F.2d at 914. Rule 53(b) clearly provides that a Master may be appointed in non-jury actions where exceptional circumstances exist and, although "a reference to a Master shall be the exception and not the rule," a

number of cases have established that this is not an impossible standard to meet.

⬛ A trial court may appoint a Master to achieve the resolution of a complicated case where promptness is required by the public interest. *Johnson Fare Box Co. v. National Rejectors, Inc.*, 269 F.2d 348, 351 (8th Cir.1959) (District Court did not abuse discretion in referring "all issues of fact and law" in complicated patent infringement case to Special Master for comprehensive report and recommendation). A Master may be appointed to hear evidence on a declaratory judgment action for breach of contract where the computation of damages is complex and where the convenience and presence of witnesses is a complicating factor. *Sims Consolidated, Ltd. v. Irrigation & Power Equipment, Inc.*, 518 F.2d 413, 416–17 (10th Cir.1975). Similarly, a trial court may appoint a Master to calculate damages on a breach of contract claim and to make a recommendation concerning liability for punitive damages. *American Cyanamid Co.*, 298 F.2d at 247. Likewise, the reference of an antitrust case to a Master for a determination of the amount of damages is proper. *Switzer Brothers, Inc. v. Locklin*, 297 F.2d 39, 48 (7th Cir.1961). A District Court may properly appoint a Special Master to make an accounting analysis and a compilation from books and records in evidence in an antitrust suit. *Arthur Murray, Inc. v. Oliver*, 364 F.2d 28, 29, 33 (8th Cir.1966).

⬛ A Special Master may be used to receive evidence and submit recommended findings of fact and conclusions of law concerning the effect of a municipal annexation plan on black voters. *See City of Richmond v. United States*, 422 U.S. 358, 95 S.Ct. 2296, 2302, 45 L.Ed.2d 245 (1975). The trial court may refer issues to a Master for a hearing and report where potentially substantial economic concerns are involved and where expeditious resolution of difficult issues is required. *Helene Curtis Industries v. Sales Affiliates*, 199 F.2d 732, 733 (2d Cir.1952) (request for mandamus relief to vacate order of reference denied) (pre-*LaBuy* decision). A Master

may be appointed to conduct a comprehensive analysis of highly technical data. *Costello v. Wainwright*, 387 F.Supp. 324, 325 (M.D.Fla.1973). In addition, the number of parties involved and the nature and volume of evidence to be presented are relevant to the determination of whether "exceptional circumstances" exist within the meaning of Rule 53. *See Burgess v. Williams*, 302 F.2d 91, 93 (4th Cir.1962) (trial court did not abuse discretion in referring to Master "complicated" bankruptcy matter requiring factual findings regarding nature of each of 1500 individual financial contributors; request for writ of mandamus seeking removal of Master thereby denied); *Powell v. Ward*, 540 F.Supp. 515, 517 (S.D.N.Y.1982) (Special Master appointed to hear, report and recommend on the issue of damages for 98 separate instances of due process violations); *Swacker v. Interstate Railroad Co.*, 32 F.R.D. 234, 237–38 (W.D.Va. 1962) (46 employee grievance claims referred to Master for report in light of time, detail and individual consideration required); *Biechele v. Norfolk & Western Railway Co.*, 309 F.Supp. 354, 358–59 (N.D. Ohio 1969) (Master appointed to determine damages of over 700 plaintiffs in environmental nuisance case); *Wattleton v. Ladish Co.*, 520 F.Supp. 1329, 1350 (E.D.Wis. 1981), *aff'd* 686 F.2d 586 (7th Cir.1982) (determination of damages owed to each member of class in an employment discrimination suit referred to Master); *In Re "Agent Orange" Product Liability Litigation*, 94 F.R.D. 173, 174 (E.D.N.Y.1982) (reference of discovery issues to Master appropriate because of "the magnitude of the case, the complexity of the anticipated discovery problems, the sheer volume of documents to be reviewed, ... the number of witnesses to be deposed, the need for a speedy processing of all discovery problems in order to meet the trial date").

⬛ Moreover, a Special Master may be appointed to oversee the implementation of an injunctive order. *Gary W. v. Louisiana*, 601 F.2d 240, 244–45 (5th Cir. 1979). A Master may be appointed to develop a reapportionment plan, *Moore v. Le-*

*flore County Board of Election Commissionors,* 361 F.Supp. 603, 609 (D.Miss. 1972). The appointment of a Master to oversee the desegregation of public schools is not an improper delegation of the judicial function. *Armstrong v. O'Connell,* 416 F.Supp. 1325, 1338 (D.Wis.1976). In *Chicago Housing Authority v. Austin,* 511 F.2d 82 (7th Cir.1975), the Seventh Circuit refused to grant mandamus relief seeking the removal of a Master appointed to recommend a plan concerning public housing desegregation. The Court found that mandamus relief was not appropriate because the report to be prepared by the Master was not binding on the Court, and because the Court had expressly stated that it would retain ultimate responsibility in the matter. *Id.* at 83–84.

▮ Similarly, the appointment of a Master in desegregation cases to recommend an appropriate remedy does not violate *LaBuy* because there is no danger of abdication of the judicial function. *Hart v. Community School Board of Brooklyn,* 383 F.Supp. 699, 766 (E.D.N.Y.1974) (Weinstein, J.). "A skilled master, with expertise in government housing laws and in educational administration to coordinate the efforts of the parties, is crucial if a just and workable remedy is to be devised." *Id.* at 767. In discussing the potential role of masters in complex litigation, Judge Weinstein set forth the following discussion which the Court considers particularly appropriate in the instant case:

> The expert in this case must assist the court by coordinating and evaluating remedial proposals that defendants and others are in the process of preparing pursuant to court order. He must serve an investigatory and consultative function among the parties and advise this court in technical areas so it may approve an effective remedial order. In a sense, he must bridge the gap between the court as impartial arbiter of plans placed before it and advocates protecting their clients' positions that are often narrower than that of society at large. This is a complex task not envisoned in draft-

ing the expert witness provisions of proposed Rule 706....

Rule 53 of the Federal Rules of Civil Procedure permits district courts in non-jury cases to name special masters in "any action ... upon a showing that some exceptional condition requires it." The rule is broad enough to allow appointment of expert advisors.

Courts have used broad language in speaking of possible powers of masters. The Eighth Circuit defined a master as,

> ... a public servant engaged in a public function. He is an aide to the court of his appointment. He is not the servant of the litigants, nor the servant of their attorneys. He has a positive duty and must exercise firm discretion to cause the business confided to him to be brought to a conclusion within reasonable bounds of time.

*Universal Oil Products Co. v. Hall,* 76 F.2d 258, 265 (8th Cir.), cert. denied, 296 U.S. 621, 663, 56 S.Ct. 143 [169], 80 L.Ed. 441 (1935). He has "the duties and obligations of a judicial officer," with a commission limited by the order appointing him. *In re Gilbert,* 276 U.S. 6, 9, 48 S.Ct. 210, 211, 72 L.Ed. 441 (1928).

\* \* \* \* \* \*

Appointing an expert advisor as a master in complex cases has received support from commentators. The Prettyman Committee Report on Procedure in *Anti-Trust and Other Protracted Cases,* 13 F.R.D. 62, 79–81 (1953), recommended the appointment of experts as special masters to aid courts in determining scientific or technical questions of unusual complexity. Professor Lucas' commentary in Moore's Federal Practice supports use of experts "in determining the economic and scientific facts underlying certain cases of great magnitude...." 5A Moore's Federal Practice ¶ 53.05[2] at 2958 n. 41 (1971). *See also* Dession, "The Trial of Economic and Technological Issues of Fact," 58 Yale L.J. 1019, 1242 (1949). (Cites omitted).

\* \* \* \* \* \*

[Masters] have been assigned to numerous procedural problems, including a supervision of discovery, especially in cases of large magnitude. *See, e.g., First Iowa Hydro Elec. Coop. v. Iowa-Ill. Gas & Elec. Co.,* 245 F.2d 613 (8th Cir.[1957]). . . .

Masters have been utilized in matters going to the merits, including determination of claims to money or property under court control, evaluation of profits resulting from copyright infringement, determination of complex economic issues in patent and antitrust cases, determination of issues in a shareholder's action, and formulation of recommendations for corporate reorganization under the Bankruptcy Act. (Cites omitted) In *Arizona v. California,* 347 U.S. 986, 74 S.Ct. 848, 98 L.Ed. 1121 (1954), a complex litigation over water rights involving five western states, the Supreme Court appointed a special master "with authority to summon witnesses, issue subpoenas and take . . . evidence" in order to find facts and conclusions of law on which the Court could base its decision. *See, also, e.g., Mississippi v. Arkansas,* 402 U.S. 926, 91 S.Ct. 1521, 28 L.Ed.2d 861 (1971) (appointing master in boundary dispute); 411 U.S. 913, 93 S.Ct. 1539, 36 L.Ed.2d 305 (1973) (accepting master's report); 415 U.S. 289, 94 S.Ct. 1046, 39 L.Ed.2d 333 (1974) (decision).

\* \* \* \* \* \*

Rule 53's requirement that the case referred to a master be "exceptional" is more than satisfied when a court is faced with a polycentric problem that cannot easily be resolved through a traditional courtroom-bound adjudicative process. Parties to this case have begun supplying the court with remedial plans, involving housing programs and educational administration. Any solutions will involve a multitude of choices affecting allocation of educational, housing and other resources, and each choice will affect other choices. Such many-centered problems call for informal consultations and weighing of complex alternatives us-

ing a managerial decision-making process. See Henderson, "Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication." 73 Col.L.Rev. 1531, 1534–38 (1973); Fuller, "Adjudication and the Rule of Law," 1963 Proc. A. Soc'y Int'l L.I. A skilled master, with expertise in government housing laws and in educational administration to coordinate the efforts of the parties, is crucial if a just and workable remedy is to be devised.

*Hart,* 383 F.Supp. at 764–67.

In light of the above authorities, the Court cannot accept the defendants' prohibitive interpretation of the *LaBuy* decision. Subsequent case law, as expressed by the Supreme Court and lower courts, establishes that the "exceptional circumstances" element of Rule 53 is not merely empty language. Accordingly, the issue at hand is whether this case presents exceptional circumstances justifying the authority of the Master to hold a hearing and prepare a Report and Recommendation on the issues to be presented in Phase I of this litigation.

### B. The Presence of Exceptional Circumstances in This Case.

As noted previously, the Government has requested a mandatory injunction to remedy allegedly hazardous conditions at a chemical waste site pursuant to CERCLA and RCRA provisions authorizing such relief when there is "an imminent and substantial endangerment" to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance. *See* 42 U.S.C. § 9606(a); 42 U.S.C. § 6973. The primary basis for the Court's order of reference was the need for prompt resolution of allegations suggesting a serious threat to the public and the environment. The generator defendants contend that their motion to revoke the Master's authority to try Phase I should be granted because of "recent events in the case." The generator defendants contend that there is no need for a prompt resolution of this case because the disposal site presents no immediate threat to the public. The defendants contend that even the

Government's current position is that "there is no unusual urgency to this case from the standpoint of the public health and safety." Generator defendants' motion to revoke at 7. The generator defendants suggest, without stating any factual support, that circumstances have occurred since the order of reference that eliminate the possibility of an emergency situation.

Initially, the Court observes that it is not surprising that the generator defendants would adopt the position that an imminent and substantial endangerment does not exist. The original defendants are, according to their own feasibility study, subject to joint and several liability for injunctive relief that could cost up to $75.5 million. The contention that the Government does not believe that the public health and welfare is subject to an immediate threat, however, is totally contradicted by the record.

At a hearing before the Special Master on April 24, 1985, the Government stated its position on the impact of recent developments on the issue of whether dangerous conditions presently exist at the disposal site:

> MR. BUCKHEIT (Government Counsel):
> I would add two new factors to the matters you have heard before, the first of which is that the second round of sampling for the nine wells on the north side of the river, the chemical results of that sampling [are] in, and it confirms the existence of high levels of cyanide and other metals that were detected in the first round of sampling, which suggests what is called the north-of-the-river question is not a wild good chase, as the defendants would have the Court understand.
>
> \* \* \* \* \* \*
>
> Secondly, the risk at the site is what the facts say it is. Characterizing it as an endangerment or a risk of a risk is playing with words. There are right now substantial releases of toxic chemicals into the environment, into the atmosphere, and into the river.
>
> There are also, as the defendants concede, a risk of a catastrophic release of large quantities, of very much larger quantities, of toxic chemicals from the site in the event of a flood. The defendants have conceded that flood protection is necessary. That flood could happen tomorrow. That flood could happen at any time. Neither Mr. Wolf (counsel for generator defendant AT & T Technologies) nor I could predict when it is going to happen.
>
> So as to the need to progress on, we have that need. Unfortunately, the site is so large and so complex in its problem, that there is no short, one-day remedy that can be applied. You can't go out there with a truck and haul it all away tomorrow. So there is not the ability for the EPA to conduct the kind of emergency response measures that they sometimes conduct where they go in and haul away a hundred drums of something that is found at the dump site. So there is no short-run responses that can be made that have not been made by the defendants.

Transcript of April 24, 1985 hearing at 57, 76–77.

Similar assertions by the Government are contained in its response to the motion to revoke:

> The United States respectfully requests this Court to retain the May 28th trial date. This is essential in view of the necessity of remedying the serious public health and environmental problems posed by the Conservation Chemical Company ("CCC") site. Further, the United States requests that the Court continue to rely on the Special Master to assist in moving this case as expeditiously as possible to trial.
>
> \* \* \* \* \* \*
>
> The United States contends and will prove at trial that a far more comprehensive remedy is required for the site than defendants concede. Nevertheless, the defendants' admission that some remedy is required indicates the nature of the endangerment at the site. Furthermore, despite the defendants' attempt to mini-

·mize the probabilities of contamination of the Independence, Missouri, drinking water supply, the mere spectre of that type of risk of harm to the public health justifies proceeding with trial phase fact-finding as expeditiously as possible. An appropriate remedy for the site must be ordered; only then will defendants begin to implement it.

Government's respose to motion to revoke at 2 & 5.

Therefore, the record is clear that the Government contends, as a factual matter, that hazardous conditions exist at the disposal site which present a serious and immediate threat to the public welfare and which require urgent resolution of the injunctive relief claims. *See also* Government's motion for summary judgment on liability issues (filed April 11, 1985). In its motion, the Government relied on the generator defendants' remedial investigation, deposition testimony and affidavits in concluding that the public will be subject to dangerous conditions absent a remedy.

> First, as discussed above, the defendants have sufficient cause for concern to recommend that remedial action be taken at the site. The RI (Remedial Investigation) recognizes, for example, that persons working on the site, trespassers and Mobay and KCPL employees face some risk from exposure to airborne contaminants from the site. (RI 9–21). Thus, the RI recommends that means to reduce access to the site and to "mitigate against" possible dispersion of windblown constituents be installed and maintained. (*Id.*). Similarly, the RI recognizes that "uncontrolled prolonged contact or ingestion of ... materials in the soil or stablized waste matrix may present a risk to humans" (RI 9–4), and classifies this as a "MODERATE" risk that requires remediation (RI 9–20 to 9–22). Defendants also admit that remedial action is necessary to "mitigate migration of soils and/or waste materials under heavy precipitation or flood conditions." (*Id.*).
>
> Second, the RI recognizes that hazardous materials are migrating from the site

via surface water and groundwater. (E.g. RI 9–22). In particular, the RI estimates that more than 22,000 pounds of various hazardous substances, some of which are known or suspected carcinogens, are being discharged yearly from the site into the Missouri River. Hazardous substances could continue to be discharged into the Missouri River at these rates for scores of years. (Larson Dep. 441; Nisbet Aff. ¶ 13).

> The Missouri River is used for a variety of recreational purposes, including fishing, swimming and boating. (Nisbet Aff. ¶ 12). Defendants concede that a variety of living organisms are likely to inhabit the area of the site and the Missouri River. (Nisbet Aff. ¶¶ 16–22).
>
> Finally, the defendants concede that contaminants from the CCC site could be captured by new wells in the area. (Larson Dep. 432).
>
> If no remedial action is taken at the KC site, the contamination of the environment will continue, and humans and other living things may be exposed unnecessarily to hazardous substances and hazardous waste.

Government's motion for summary judgment on liability issues at 71–73.

 Although the Government has asserted in the past that the presence of an imminent and substantial endangerment means merely the "risk of a risk," that is simply the Government's view with respect to the standard it must satisfy concerning liability issues. For the generator defendants to state, as they do now, that the Government does not contend that an emergency threatening public health exists is a mischaracterization that is completely refuted by the record. The only "recent events" which are relevant to this Court's previous finding of exceptional circumstances are the alleged discovery of dioxin at the site, the reported finding that high levels of cyanide are present in wells north of the River, and the Government's claim that the occurrence of a flood would result in the "catastrophic" release of large quan-

tities of toxic chemicals from the site. These developments all add further support to this Court's determination that the public interest in a prompt resolution of the issues constitutes exceptional circumstances within the meaning of Rule 53.

The Court notes that the generator defendants suggest the Master's participation in Phase I will only delay, rather than expedite, the outcome in this case because "the complex nature of the issues presented will require the Federal Court to undertake a thorough and detailed review of the entire complex record." Motion to revoke at 8. The generator defendants also complain that the Master has no experience in conducting trials and that he has "no background or expertise in toxicology, hydrology, or chemistry." The Court is compelled to point out that it is fortunate to have at its disposal a Master who is recognized as an expert[5] in land use and environmental law.[6] The attention the Master has afforded this case is the primary reason this litigation is in a manageable posture and ready for trial. Through March of 1985, the Master and his staff have devoted over 1,300 hours to this case, and the Master has presided over 25 hearings. The Master has submitted 16 sets of written recommendations on general pretrial matters, and 28 separate written recommendations on motions and other substantive issues. In addition, the Master has participated in numerous telephone conferences to resolve deposition disputes, and has met with the parties on an informal basis on several occasions to discuss settlement and other matters. The skill and expertise acquired by the Master in this case thus far strongly suggest that he will be equally efficient in handling the Phase I hearing. In addition, the parties are in agreement that the Master will have significant responsibility regarding Phase II allocation issues, therefore, it is reasonable that the Master supervise the Phase I hearing. Accordingly, the Court is completely satisfied that the Master will proceed with the Phase I hearing in the same efficient and expeditious manner that has characterized his participation thus far.

Regarding the assertion that the use of the Master will delay the resolution of Phase I issues, it must be noted that the Master is able to devote his full attention to the Phase I hearing on a continuous basis. Because of the belated timing of the motions to revoke and because the Court cannot completely abandon its administrative duties and its supervision of its criminal and civil dockets for a period of six months to a year, it is not possible for the Court to try the Phase I issues on a continuous basis. (*See* Discussion in Timeliness of Motions to Revoke, *Infra*). There is no question that the Court's use of the Master will expedite Phase I and further protect the public interest in achieving a prompt resolution of this litigation.

Finally, the Court is compelled to clarify the record with respect to the generator defendants' conclusion that this is a "gar-

---

**5.** Dr. Robert Freilich is the Hulen Professor of Law in Urban Affairs at the University of Missouri School of Law, specializing in land use and environmental and public law issues, holding five degrees (A.B. University of Chicago, J.D. Yale Law School, M.I.A., L.L.M. and J.S.D. from Columbia University). He is the Editor of the Urban Lawyer, the national quarterly journal on urban law of the American Bar Association, and the author of five books as well as numerous articles in the field. He is also on the Advisory Board of the Land Use and Environmental Law Review. Professor Freilich has been engaged as an active practitioner for twenty-seven years in both federal and state courts on these issues. He is a member of the Missouri and New York Bars, has argued over 90 appeals to state and federal appellate courts, and has acted as counsel to public and private parties in numerous complex land use and environmental cases. Professor Freilich was a partner in a New York firm specializing in litigation for ten years and is the president of a Kansas City firm specializing in land use, environmental and public law matters throughout the United States.

**6.** Moreover, two experts have been appointed by the Court pursuant to Fed.R.Evid. 706. Although these experts are nontestifying experts and will not present evidence concerning the ultimate issues in this case, these experts will assist the Master and the Court in an advisory capacity concerning technical and scientific issues.

den variety CERCLA case" and that it is not "unusual or unique." Initially, it is difficult to grasp what a "garden variety" CERCLA case is, because the Court is aware of only one § 9606(a) case which has ever reached trial on the merits, and that case was tried in this District. *See United States v. Northeastern Pharmaceutical and Chemical Co., Inc.*, 579 F.Supp. 823 (W.D.Mo.1984) (*"NEPACCO"*). This case is far more complex than *NEPACCO*. This case is complex procedurally because of the number of parties, because of the presence of two classes of third-parties, and because of the presence of cross-claims and counter-claims requiring liability and apportionment determinations. This case is complex factually because substantial proof will be based on voluminous documentary evidence and expert testimony.

The generator defendants complain that the use of a Special Master in litigation of this type is without precedent. This statement is partially correct, because no other CERCLA case of this magnitude has reached the trial stage without settlement. However, in *United States v. Stringfellow*, No. 83–2501 (C.D.Cal.1984), a Special Master has been appointed to supervise discovery and recommend rulings on pretrial motions. In *Stringfellow*, the Government brought an action for injunctive relief under § 9606(a) against 39 defendants. As of this date, 54 third-party defendants have been joined in that litigation. Although the original order of reference in *Stringfellow* was silent regarding the Master's authority to issue a report and recommendation on the injunctive claims, this Court has been advised that motions presently are pending which request the District Court to grant the Master authority to hold evidentiary hearings and issue recommendations on selected issues contained in the injunctive relief claims.

In conclusion, there are a number of factors warranting the authority of the Special Master to prepare a report and recommendation on Phase I issues. First and foremost, the Government maintains, with apparent evidentiary support, that there is a serious and immediate threat to public health involving the presence of high levels of dioxin and cyanide, the threat of groundwater contamination, the possibility of chemical migration to populated areas and drinking water supplies, and the danger of a catastrophic release of large quantities of toxic chemicals in the event of a flood because the Conservation Chemical site is located in the flood plain. Second, the time required for the Phase I hearing, six months to a year (some parties have estimated that it will take longer than one year), requires that the injunctive issue be resolved with a high level of continuity which this Court cannot provide. Third, the complexity of issues and volume of evidence to be presented contributes to the need for a complete and uninterrupted hearing. Fourth, the Special Master has already acquired irreplaceable expertise in this case by virtue of his extensive involvement thus far. In particular, the Court notes that the Master has conducted several hearings on technical and scientific issues. In addition, the Master's continued participation in Phase I is mandated by his undisputed authority to oversee any injunctive relief order and to assist in the determination of any allocation formula in Phase II. Fifth, the authority of the Special Master has been adequately limited so that the basis of judicial power remains in the Court. (*See* Discussion on Article III Considerations, *Infra.*)

Accordingly, the Court again concludes that the public interest alone, and especially when combined with the above factors, constitutes exceptional circumstances within the meaning of Rule 53 sufficient to justify the authority of the Master to issue a report and recommendation on Phase I issues. Rule 53 provides "that reference to the Master shall be the exception; delay, expense, and the postponement of judicial consideration all so suggest. But the very existence of a rule providing for an exceptional course means that occasionally at least that course may be followed." *Helene Curtis Industries*, 199 F.2d at 733. In *Helene Curtis Industries*, the Second Circuit refused to grant a re-

quest for mandamus relief requiring the District Court to vacate the reference of "all issues" in a complex patent infringement suit to a Master because an expeditious determination was warranted in light substantial economic consequences to an entire industry. *Id.*

Similarly, in *Rogers v. Societe Internationale*, 278 F.2d 268 (D.C.Cir.1960), the Court of Appeals for the District of Columbia refused to vacate or modify a trial court order referring "all issues of fact and law" to a Special Master in a complex shareholders' suit. *Id.* at 270–72. In finding that exceptional circumstances existed within the meaning of Rule 53, the Court noted that the suit involved intricate litigation concerning the claims of over 2,400 parties regarding $100 million in corporate assets. The Court in *Rogers* observed that the litigation had evolved over a period of several years, that the Master had already conducted several hearings, and that "to limit the scope as prayed would change the whole pattern of the proceedings and cause confusion and uncertainty in many aspects of this complicated case which are now impossible to visualize." *Id.* at 271–72. The Circuit Court in *Rogers* observed that the order of reference left the final determination of all issues with the trial court, and that the trial court was not bound by the Master's conclusions of law. *Id.* at 272. The Court also noted that, as in this case, the trial court was available to entertain challenges and exceptions to the Master's actions, and that "even as to the Master's ultimate report, objections conformably to the Rule shall be subject to hearing, to modification, rejection and even to the receipt of further evidence. Nor should it be overlooked that the evidence in this case is largely documentary." *Id.*

The court in *Rogers* evaluated those circumstances and concluded that "[t]his is no *LaBuy* case." 278 F.2d at 271. The Court noted that in *LaBuy*, a 5–4 decision, the main issue was not the scope of Rule 53, but rather the *LaBuy* court was more "concerned with the *power* of a Court of Appeals to issue its writ of mandamus to compel a District Judge to vacate certain orders of reference." *Id.* at 271 n. 4 (emphasis original). The Court concluded that "factually, ... and under the law which is intended to govern the reference, the circumstances in the instant case are totally different from *LaBuy*." *Id.*

Like the factual background in *Rogers*, the situation at hand is completely different than *LaBuy* and *Liptak*. Exceptional circumstances exist primarily in the need for prompt resolution of issues involving serious allegations concerning public health and environmental welfare. This necessity, combined with the procedural posture and factual complexity of this litigation, supports this Court's order of reference. In addition, the expertise acquired by the Master thus far and the preservation of the Court's judicial responsibility also weigh strongly in favor of the reference. The services of the Master have been indispensable in preparing this case for dispositive action, and the Master's continued participation will bring Phase I to the most rapid resolution possible. Although the parties will be required to bear some additional expense as a result of the effort required of the Master, the fact that the Master's assistance will more quickly bring this case to a conclusion will undoubtedly more than offset the immediate costs incurred. Accordingly, the Court stands by its original order of reference.

## III. TIMELINESS OF THE MOTIONS TO REVOKE THE MASTER'S PHASE I AUTHORITY

On July 20, 1984, this Court issued its order of reference carefully detailing the Master's authority. As of that date, all of the generator defendants/third-party plaintiffs were parties to the suit. All of the third-party defendants have been parties to this litigation since October of 1984. By order dated July 20, 1984, the Phase I hearing was originally set to commence on February 18, 1985. The order of reference was explicit in stating that, in addition to issuing recommendations on discovery and pre-trial matters, the Special Master was to

hold hearings and report on claims for injunctive relief and apportionment. Because of continuances necessitated by the parties, including requests for relief from the expedited discovery schedule, requests for a stay of proceedings to pursue settlement, and because of subsequent impleading of additional third-party defendants by the generator defendants, the commencement of the Phase I hearing was rescheduled first to April and then to May 13, 1984. By recommendation filed February 11, 1985, the hearing on Phase I issues was set to commence on May 28, 1985. That date presently stands. The initial motion by the generator defendants to revoke the Master's authority was filed on April 17, 1985. Thereafter, similar motions by third-party generator defendants were filed.

According to Fed.R.Civ.P. 46, formal exceptions to rulings or orders of the Court are unnecessary unless "an exception has heretofore been necessary." The Eighth Circuit has stated that the failure to make timely objection to the appointment of a Master either at the time of the order of reference or promptly thereafter constitutes a waiver of error. *First Iowa Hydro Electric Cooperative v. Iowa-Illinois Gas & Electric Company,* 245 F.2d 613, 628 (8th Cir.1957). *See also Spaulding v. University of Washington,* 740 F.2d 686, 695 (9th Cir.1984). Whether the combination of circumstances which prompted the appointment of a Special Master constitutes an "exceptional condition" justifying the reference is a procedural matter to which personal objection should be made, unless as a matter of law the trial court abused its discretion concerning the appointment. *Liptak v. United States,* 748 F.2d 1254, 1257 (8th Cir.1984). In particular, the nature of an objection to the appointment of a Special Master should be specifically stated, and a party has no right to rely on the objection of another. *See McGraw-Edison Co. v. Central Trans-*

*former Corp.,* 308 F.2d 70, 74 (8th Cir. 1962). In general, objections must be sufficiently specific to bring into focus the precise nature of the alleged error. *See Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 483, 87 L.Ed. 645 (1943); *Bertrand v. Southern Pacific Co.,* 282 F.2d 569, 571 (9th Cir.1960).

In addition, Fed.R.Civ.P. 7(b)(1) defines a motion as "an application to the Court for an order," and requires that the motion "state with particularity the grounds therefor, and shall set forth the relief or order sought." Where a party merely objects to a court's order, rather than making application for relief or other order, such an action does not constitute a motion within the meaning of Rule 7(b)(1). *St. Paul Fire & Marine Insurance v. Continental Casualty Co.,* 684 F.2d 691, 693 (10th Cir.1982).

The motion filed on April 17 was the first specific request by any party to revoke the Master's authority to hear Phase I issues. Although the Government filed a motion on July 30, 1984 for reconsideration[7] of the Court's order of reference, this motion did not expressly seek the revocation of the Master's Phase I authority, nor did the generator defendants move to revoke the Master's authority. Instead, on August 9, 1984, the generator defendants filed a "joint memorandum in opposition to plaintiff's motion for reconsideration" of the Court's July 20, 1984 orders.

In the text of its opposition, the generator defendants state the following:

> Plaintiff's motion [for reconsideration] should be rejected. With regard to plaintiff's technical objections, we demonstrate below that, although extraordinary efforts will be required, with assistance from the Master a site investigation can reasonably and safely be completed within the Court's general schedule.

---

**7.** A ruling on the motion was deferred after it became evident that the Government did not desire to seek mandamus relief on the issue. By holding the ruling in abeyance, the Court was afforded the opportunity to evaluate the viability of the Court's reference. It quickly became apparent that the assistance of the Master was essential for purposes of expediting this litigation. The motion subsequently was denied.

Generator defendants' Joint Opposition at 2. Similarly, in the original generator defendants' "Memorandum and Agenda for August 10, 1984 pre-hearing conference" before the Special Master (attached as Exhibit B to original defendant's Joint Memorandum in Opposition to plaintiff's Motion for Reconsideration), the generator defendants state:

> The outcome of Phase I would be a recommended determination by the Master of whether an imminent and substantial endangerment exists at the site. If so, he should also recommend what the remedy should be and propose a list of contributors to the site who would be provisionally responsible to implement that remedy.
>
> If the Master's Recommendation contains some form of remedial action, defendants anticipate that, in order to bring Phase I to a conclusion, there will be a period of ongoing settlement discussions on the preliminary allocation of costs. If necessary, Phase I will be concluded by a hearing on the provisional allocation of costs and on the funding of required remedial measures.

Generator defendants' Memorandum and Agenda at 3. While the record is clear that the generator defendants have always understood that the Master would supervise the Phase I hearing, no action had been taken by the generator defendants to revoke the Master's Phase I authority, although the following language found in a footnote in its response in opposition to the Government's motion for reconsideration:

> For the record, defendants agree with plaintiff's contention that the authority conferred on the Special Master by the

Court's July 20, 1984 order of reference is excessive. Accordingly, defendants join the Government's motion insofar as it objects to the scope of the Master's authority. (Motion pp. 16–19). This Court may clearly appoint a Master to supervise discovery and conduct other pretrial proceedings in this case. *See American Honda Motor Co., Inc. v. Vickery [Vickers] Motors, Inc.*, 64 F.R.D. 118 (W.D.Tenn.1974). However, the complexity of this case and the urgent need for prompt resolution of the issues do not ordinarily constitute the "exceptional condition" required under Fed.R.Civ.P. 53 as a prerequisite to appointment of a Master for other purposes. *See LaBuy v. Howes Leather Co.*, 352 U.S. 249, 254 [77 S.Ct. 309, 312, 1 L.Ed.2d 290] (1957).

Generator defendants' Joint Memorandum in Opposition to plaintiff's Motion for Reconsideration at 13 n. 5.[8]

█ Although the generator defendants have been aware of the Master's Phase I authority since July 20, 1984, they failed to voice a specific objection or seek revocation of that authority until the commencement of the Phase I hearing was less than six weeks away. Even assuming that their general objection in their "opposition" to the government's motion for reconsideration is sufficient to preserve error under Fed.R.Civ.P. 46, the Court concludes that their present motion, filed nearly nine months after the Order of Reference, must be denied in light of the circumstances.

As noted previously, the Phase I hearing has been estimated by the parties to require six months to one year. These estimates were made on the assumption that

---

**8.** Regarding the generator defendants reference to the *LaBuy* case above, the Court is compelled to observe that the *LaBuy* case did not consider whether the need for prompt resolution of issues could constitute an "exceptional circumstance" within the meaning of Rule 53. On the contrary, other courts have approved references where promptness was a factor. *See Johnson Fare Box Co.*, 269 F.2d at 351 (Eighth Circuit held that trial court did not abuse discretion in referring "all issues of fact and law" to Master where it was in the "public interest" to try case "promptly"); *Helene Curtis Industries v. Sales Affiliates*, 199 F.2d at 733 (reference appropriate to "expedite" "difficult and troublesome issues"); *In Re "Agent Orange" Product Liability Litigation*, 94 F.R.D. at 174 (reference to Master warranted due to "need for speedy processing" of issues). Thus, the generator defendants' citation to *LaBuy* for the proposition that urgency cannot constitute an exceptional circumstance is both erroneous and contrary to existing case law.

the Phase I hearing would be held before the Master on a continuous basis with regularly scheduled recesses. By recommendation filed February 11, 1985, the Phase I hearing was set to commence on May 28, 1985. This framework has been understood and relied on in a number of important respects.

First, the Master has made significant sacrifices so that the hearing of Phase I issues may proceed on a continuous basis. The Master, currently a chaired Professor of Law at the University of Missouri-Kansas City School of Law, is Director of the School's Urban Legal Affairs Program. The parties have known for some time that if the settlement negotiations failed, the Master would seek a leave of absence from the Law School so that his efforts could be directed toward the prompt resolution of Phase I. The Master has in fact requested and received a leave of absence from his professorship, and an offer has been extended by the Law School faculty to a visiting professor to instruct the courses presently taught by Professor Freilich.[9]

In addition, in reliance on the probability that the Master would supervise the Phase I hearing, the Court has set its criminal and civil dockets for the balance of the year. Should the Master's authority to supervise Phase I be revoked, this Court will eliminate its existing docket to the extent possible so that the prompt resolution of Phase I may be achieved. Although the Phase I hearing will commence as scheduled on May 28, regardless of the outcome of any mandamus action, the Court will be unable to try Phase I continuously because a significant part of its established docket cannot be continued indefinitely. Had the original defendants successfully sought the revocation of the Master's authority in a more timely manner, the Court possibly could have made provisions for the expedit-

ed and continuous trial of Phase I which this litigation requires.

Moreover, the vast majority of the parties in this case have planned their Phase I strategy and schedules based on the premise that the hearing will be held continuously before the Master. Extensive timetables have been established by the Master regarding motion practice leading up to Phase I, and a detailed plan concerning the appropriate order of proof is currently being devised. The revocation of the Master's authority at this point would severely disrupt the framework of Phase I as anticipated by the parties. The Court notes that third-party insurance defendants have expressed their opposition to the motions to revoke.

Finally, because courtroom space in the Federal Courthouse is insufficient to accommodate the number of parties participating in this case, action has been taken to obtain access to alternative facilities for purposes of the Phase I hearing. Through the Clerk of the Court, administrative actions have commenced by the General Services Administration for the purpose of leasing auditorium space. Negotiations have been based on the premise that the Phase I hearing will last from six months to a year and will be held continuously. Specifically, the General Services Administration is presently attempting to secure a six-month lease with a six-month option. Likewise, a committee consisting of various lawyers in this case has been established to provide input relevant to the lease negotiations. It is obvious that the nature of those negotiations would be significantly different if the Phase I hearing was not going to be held before the Master because a hearing on a non-continuous basis by the Court will necessitate a lease for a significantly longer period of time at greater cost to the Government.

---

**9.** At the hearing of March 27, 1985, the Master advised the parties as follows:

> Let me make one further announcement. I have officially put in for leave of absence, and I will not be teaching during the entire year. Whether this case is settled or not is immaterial to me and I will try at all lengths to

continue efforts to settle the case, but you have my one hundred percent devotion to this thing if we do try this case. I just want to make sure that every party understands that fact.

Transcript of hearing of March 27, 1985 at 123–24.

The Court concludes that even if the motions to revoke are considered timely for technical purposes, they must be denied due to the reliance that the Master, the Court and the parties have placed on the longstanding grant of authority to the Master to hear Phase I issues. Although the Government continues to maintain its original position concerning the Master's authority, it has expressed its belief that the purpose of the generator defendants' motion to revoke is merely a device to further delay the commencement of Phase I. "Their motion is a thinly veiled attempt to postpone the May 28th trial date.... Other than disruption of the Court's schedule and postponement of the bill for cleanup of the CCC site, it is difficult to imagine the reason for such a tactical filing at this point." Government's response to defendants' motion to revoke at 1. Similarly, at the hearing before the Master on April 24, 1985, the Government expressly stated that it was prepared to commence the Phase I hearing as scheduled and that the hearing should not be delayed. At the hearing, the Government clearly stated its opinion concerning the motions to revoke:

> MR. BUCKHEIT (Government counsel): The action of the defendants in the past week, filing a motion to revoke the order of reference to the Special Master five weeks before trial makes it a virtual certainty that our witnesses will not testify for several months.
>
> I don't think there is any point in speaking to the legal issues they raise. The question I have is why did they wait until now. There is nothing new with respect to the issues in that motion since the August timetable when the government filed similar papers. At that time they conceded the legal issue in a footnote that they declined to join us in the motion.

> Now, the transparent attempt to bolt the trial schedule, they filed papers and threaten to take matter to the Eighth Circuit. Had they filed that motion in a timely fashion, Judge Wright could have made room on his calendar to have the trial start on time and devote the substantial amount of time that will be required to hear this matter.
>
> I don't know what Judge Wright's schedule is, but I have a hard time imagining that he will be able to clear the decks for an extended period. If Judge Wright does grant the defendants' motion, we will have to wait in a period of limbo while we wait to see if defendants go to the Eighth Circuit. If they do go to the Eighth Circuit, we have to wait until that matter is resolved by that body, but I would suggest it will be indeed a very long time before our experts ever speak on water issues.

Transcript of April 24 hearing at 60–61.

The Court concurs in the Government's opinion to the extent that it believes that the generator defendants, as well as the third-party defendants, have had ample opportunity to express concerns based on Article III and Rule 53 arguments about the Master's Phase I authority. The law on these subjects is no different now than it was at the time of the reference, and there is no legal or factual justification for the belated attempt to remove the Master from the Phase I hearing. Accordingly, the Court concludes that even assuming Rule 53 standards have not been satisfied, the motions to revoke should be denied on the separate and alternative grounds that the motions are not timely [10] and that the parties thereby are estopped to request such relief in light of the circumstances.

## IV. ARTICLE III CONSIDERATIONS

The generator defendants and certain third-party generator defendants

---

**10.** In holding that the parties waived any error to the reference to a Master, the Eighth Circuit stated that if "there had ever been any ground for the plaintiffs to question the delegation by the Court..., it has been fully and completely waived by the plaintiffs.... Although the plaintiffs entered objections to the appointment of [the Master] when they appeared before him on certain occasions, they did not present such an objection" to the trial court in the form of a motion until after "the Master had held numerous hearings and entered numerous orders and plaintiffs had frequently invoked his jurisdiction." *First Iowa Hydro Electric Cooperative v. Iowa-Illinois Gas & Electric Co.,* 245 F.2d 613, 627 (8th Cir.1957) (post-*LaBuy* decision).

contend that the Master's authority to hold a hearing and report on Phase I issues deprives them of trial by a judge vested with judicial power under Article III of the Constitution. Initially, the Court notes that whether the appointment of a Special Master constitutes a denial of due process is to be tested by an appraisal of the totality of facts in a given case. *McGraw-Edison Co. v. Central Transformer Corp.*, 308 F.2d 70, 72 (8th Cir.1962). Regarding Article III considerations, Article III is violated when a non-Article III entity is vested with federal judicial power and where the Supreme Court has not determined that such a delegation is within the area of law that non-Article III courts may adjudicate. *See Turner v. Japan Lines, Ltd.*, 562 F.Supp. 348, 354–55 (D.Or.1983).

In holding that the Bankruptcy Reform Act violated Article III because of an overly broad grant of jurisdiction to non-Article III bankruptcy judges, the Supreme Court in a plurality opinion stated that while the power to adjudicate "private rights" must be vested in an Article III court,

> "This Court has accepted fact finding by an administrative agency, ... as an adjunct to the Art. III Court, analogizing the agency to a jury or a Special Master and permitting it in admiralty cases to perform the function of a Special Master. *Crowell v. Benson*, 285 U.S. 22, 51–65 [52 S.Ct. 285, 292–98, 76 L.Ed. 598] (1932)." *Atlas Roofing Co. v. Occupational Safety Comm'n*, 430 U.S. 442, 450 n. 7, 97 S.Ct. 1261, 1266, n. 7, 51 L.Ed.2d 464 (1977).

*Northern Pipeline Const. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 2875, 73 L.Ed.2d 598 (1982). The Court noted that a delegation of authority is consistent with Article III so long as the "essential attributes of judicial power" are retained in the Article III court. *Northern Pipeline Const.*, 102 S.Ct. at 2874 n. 29. There is, however, " 'no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts shall be made

by the judges....' " *Northern Pipeline Const.*, 102 S.Ct. at 2875, quoting *Crowell v. Benson*, 52 S.Ct. at 292. In *Crowell*, the Supreme Court upheld the use of administrative agencies as adjunct fact-finders, so long as those adjuncts were subject to sufficient control by an Article III court. The Court in *Crowell* found sufficient limitations in the authority of the agency in that the agency did not possess the authority to enforce any of its orders, and every order was subject to appeal to the federal district court which had the sole power to enforce or set aside the order.

Similarly, in *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), the Supreme Court upheld the 1978 Federal Magistrates Act, which permitted District Court judges to refer certain pretrial motions to a magistrate for initial determination. The Court noted that the magistrate's proposed findings and recommendations were subject to review by the District Court, which was free to rehear the evidence or to call for additional evidence. 100 S.Ct. at 2412–13. In addition, the Supreme Court noted that the magistrate considered motions only upon reference from the District Court, and the magistrates were appointed and subject to removal by the District Court. 100 S.Ct. at 2417. The Supreme Court held that the Act did not violate the constraints of Article III because the ultimate decisionmaking authority clearly remained with the District Court. 100 S.Ct. at 2415–16.

The Supreme Court decisions in *Crowell* and *Raddatz* establish two basic principles concerning the delegation of traditionally judicial functions to non-Article III officers. *Northern Pipeline Const.*, 102 S.Ct. at 2876. First, Article III does not require all factual determinations to be made by judges, and some factual determinations may be made by a specialized factfinding adjunct without violating Article III. *Id.* Second, the functions of the adjunct must be limited in such a way that "the essential attributes" of judicial power are retained in the Article III court. *Id.* In *Crowell*, the Supreme Court noted that

the reservation of full authority to the Court to deal with matters of law provides for the appropriate exercise of the judicial function. *Crowell*, 52 S.Ct. at 293. Similarly, in *Raddatz*, the Supreme Court refused to invalidate the Magistrates Act by noting that the authority and responsibility to make an informed final determination remains with the judge. 100 S.Ct. at 2415.

The Eighth Circuit, sitting en banc, recently held that a section of the Magistrates Act (28 U.S.C. § 636(c)) did not violate Article III. *Lehman Brothers Kuhn Lo, Inc. v. Clark Oil & Refining Corp.*, 739 F.2d 1313 (8th Cir.1984). Section 636(c) provides that, on the consent of the parties and when so designated by a District Court, a magistrate may conduct any or all proceedings in a jury or non-jury civil matter and order entry of judgment in the case. The Court in *Lehman Brothers* noted that its decision was not controlled by *Northern Pipeline Const.* because that case did not involve consent to the adjunct's authority. Although the Court observed that waiver of Article III protection was a factor to be considered, the Court was more concerned with the separation of powers aspect of Article III. 739 F.2d at 1313. The Eighth Circuit in *Lehman Brothers* analyzed the Magistrates Act, including provisions governing the appointment of magistrates, reference of cases to and recall from magistrates, and appellate review. The Eighth Circuit concluded that these provisions "leave Article III courts firmly in control of the system as a whole... In our opinion, these mechanisms limit the magistrate's role to that of adjunct, safeguard the integrity of the Article III judiciary, and keep Section 636(c) within the bounds set by Article III of the Constitution." *Lehman Brothers*, 739 F.2d at 1315.[11]

The general case law concerning the appropriate use of Masters contributes to the preservation of the Court's essential judicial function in the instant case. The Court has a duty to review a Master's report and make a final determination of all the issues. *Rogers v. Societe Internationale*, 278 F.2d at 272. A rigorous standard of review applies to conclusions of law or conclusions of mixed fact and law. *Spencer v. Newton*, 79 F.R.D. 367, 370 (D.Mass.1978). "The Master's 'conclusions of law' have no effect on the District Court except to the extent that they are correct, (cite omitted) and are, in effect, merely recommendations to the Court. The Master's ultimate findings involving mixed questions of law and fact are subject to close review by the Court." *Levin v. Garfinkle*, 540 F.Supp. 1228, 1236–37 (E.D.Pa. 1982).

Rule 53(e)(2) expressly provides that in "an action to be tried without a jury the Court shall accept the Master's findings of fact unless clearly erroneous." However, when the findings are based not on credibility issues, but instead "on documentary evidence, stipulated facts, or other nondemeanor testimony, the secondary inferences and conclusions of the Master from these sources are not entitled to controlling weight and are subject to greater scrutiny because [the] Court is equally capable of making such deductions." *Spencer v. Newton*, 79 F.R.D. at 370–71. Moreover, Rule 53(e)(2) expressly provides that the "court after a hearing may adopt the report or may modify it or reject it in whole or in part or may receive further evidence or may recommit it with instructions."

Most importantly for Article III purposes, the Supreme Court has stated that there is no constitutional requirement that "in order to maintain the essential attributes of judicial power, all determinations of

---

11. The Eighth Circuit's ruling in *Lehman Brothers* is consistent with recent decisions of other circuits. Six other circuits considering the issue have upheld the constitutionality of § 636(c). *See Goldstein v. Kelleher*, 728 F.2d 32 (1st Cir. 1984); *Collins v. Foreman*, 729 F.2d 108 (2nd Cir.1984); *Wharton-Thomas v. United States*, 721 F.2d 922 (3d Cir.1983); *Puryear v. Ede's Ltd.*, 731 F.2d 1153 (5th Cir.1984); *Geras v. Lafayette Display Fixtures, Inc.*, 742 F.2d 1037 (7th Cir.1984); and *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.*, 725 F.2d 537 (9th Cir.1984) (en banc), reversing 712 F.2d 1305 (9th Cir.1983) (panel decision).

fact in constitutional courts shall be made by judges." *Crowell,* 52 S.Ct. at 292. As noted previously, the *Crowell* court upheld the delegation of fact-finding to administrative agencies and observed that in "cases of equity and admiralty, it is historic practice to call to the assistance of courts, without the consent of the parties, masters, commissioners, or assessors...." *Id.*

■ The decisions in *Northern Pipeline Const., Crowell, Raddatz* and *Lehman Brothers* make it clear that delegations of authority do not violate Article III so long as the essential attributes of power remain vested in the Article III court. There is no requirement that all factual determinations be made by Article III judges in order to maintain the essential attributes of judicial power. Although waiver by consent may be one factor in determining whether Article III guarantees are satisfied, consent is not necessary if there are sufficient limitations on the adjunct and if the ultimate decisionmaking authority clearly remains with the District Court.

■ In the instant case, the following safeguards are present so that the "essential attributes of judicial power" remain with this Court. The authority of the Special Master has been explicitly defined in this Court's previous order of reference. The Court has appointed the Master subject to several limitations, and the Court likewise has the power to terminate his authority. The parties have been and will continue to be afforded the opportunity to object, respond, or comment on any recommendation filed by the Master. The Court is required to review independently all recommendations filed by the Master, and the Court has retained the authority to adopt, modify or reject any recommendation. In addition, following the filing of the Master's report on Phase I issues, the Court will hold a hearing pursuant to Rule 53(e)(2) so that it may determine whether to adopt, modify or reject the report, receive further evidence, or recommit it with instructions.[12] Furthermore, the Master's recommended conclusions of law are subject to a rigorous standard of review, as are his conclusions of mixed fact and law. Moreover, because a significant number of issues in this case will turn on documentary evidence and other nondemeanor testimony, the Master's recommended findings of fact will be subject to greater scrutiny than is provided for under the clearly erroneous standard. *Spencer, supra.*

---

12. Following the hearing on the report and recommendation, the Court will independently review the record as required. *See United States v. Louisiana,* — U.S. —, 105 S.Ct. 1074, 1080, 84 L.Ed.2d 73 (1985), *Mississippi v. Arkansas,* 415 U.S. 289, 94 S.Ct. 1046, 1047–48, 39 L.Ed.2d 333 (1974); *Colorado v. New Mexico,* — U.S. —, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984); *United States v. Maine,* — U.S. —, 105 S.Ct. 992, 83 L.Ed.2d 998 (1985). Following review of the record, the Master's report, and the exceptions, briefs, and arguments of the parties, the Court will issue a substantive opinion analyzing the report and the objections thereto. *See, e.g., United States v. Louisiana,* — U.S. —, 105 S.Ct. 1074, 84 L.Ed.2d 73 (1985); *United States v. Maine,* — U.S. —, 105 S.Ct. 992, 83 L.Ed.2d 998 (1985).

The parties and the Court have had the benefit of numerous detailed recommendations submitted by the Master. The Master has established several schedules and timetables to guide this litigation through pretrial discovery and motion practice. In addition, the Master has submitted recommendations on substantive issues containing precise and in-depth analysis of both legal and factual issues. *See, e.g.,* Special Master's Recommendations regarding: General Dynamics Corporation's demand for a jury trial (filed April 29, 1985); motions to dismiss based on sovereign immunity grounds (filed January 29, 1985); motions to dismiss or strike the third-party complaint on due process grounds (filed January 24, 1985); third-party generator defendants' motions to dismiss on de minimis grounds (filed November 14, 1984); and class certification and bifurcation (filed November 14, 1984). The Court anticipates that substantive orders will be entered in the near future analyzing previously adopted recommendations and other pending issues in this case, depending on the extent to which the Court's present schedule is affected by the generator defendants' threatened mandamus action. A significant number of substantive legal issues have been resolved by a previous court order. *See United States v. Conservation Chemical Co.,* 589 F.Supp. 59 (W.D. Mo.1984) (CERCLA allows for imposition of strict liability and joint and several liability on past non-negligent off-site generators and transporters).

In conclusion, the carefully-defined delegation of authority to the Master in the instant case does not deprive the Court of the essential attributes of its judicial power. Like reference to Magistrates, the authority and responsibility to make an informed and final determination remains with the judge. *See Keller v. Matthews,* 543 F.2d 624, 624 (8th Cir.1976). *See also Mathews v. Weber,* 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976); *Reciprocal Exchange v. Noland,* 542 F.2d 462 (8th Cir. 1976). Therefore, the reference to the Special Master in the instant case does not violate the constraints of Article III because the ultimate decisionmaking authority clearly remains with the District Court. *See Raddatz,* 100 S.Ct. at 2415–16. Accordingly, the motions by the generator defendants and third-party generator defendants seeking revocation of the Master's authority on Article III grounds are without merit.

## V. THE MASTER'S PARTICIPATION IN SETTLEMENT DISCUSSIONS

The generator defendants suggest that the potential for prejudice exists because "the Special Master has participated actively in settlement discussions, thus acquiring extensive nonrecord information. These discussions have involved *ex parte* meetings with the individual parties, in which the parties were encouraged to express candidly their settlement positions." Generator defendants' motion to revoke at 11 n. 1. No other factual assertions were submitted in support of this contention.

Initially, the Court acknowledges that the Master has participated in settlement discussions at the direction of the Court and at the request of many of the parties. The Phase I hearing was delayed for several weeks because the parties had advised the Master and the Court that extensive settlement negotiations could prove successful. Despite the Master's supervision, the parties were unable to reach agreement on any issue subject to settlement discussions.

As far as the settlement discussions in this case are concerned, the Special Master has served approximately the same function that a judge would fulfill in attempting to resolve this litigation. Accordingly, the standards to be applied in evaluating the Master's conduct should be similar to those used to examine judicial conduct. Generally, in order to disqualify a judge, the "alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). *See also United States v. Hollis,* 718 F.2d 277, 280 (8th Cir.1983).

In this case there is no suggestion that the Master is biased by virtue of any act other than his participation in the case. Settlement negotiations clearly are not an "extrajudicial" source of information, and participation in settlement discussions does not require disqualification. *See Matter of Georgia Paneling Supply, Inc.,* 581 F.2d 520, 522 (5th Cir.1978) (occurrence of *ex parte* conferences between bankruptcy judge, trustee and lawyer to negotiate settlement of suit does not require disqualification); *Lazofsky v. Sommerset Bus Co., Inc.,* 389 F.Supp. 1041, 1044 (E.D.N.Y.1975) (disqualification of judge not required by *ex parte* settlement conference). *See also United States v. Cepeda Penes,* 577 F.2d 754, 758 (1st Cir.1978) (judge's participation in plea discussions in criminal case, without more, does not provide a reasonable basis for questioning his partiality).

Although the newly amended recusal provisions for judges found at 28 U.S.C. § 455(a) "now *permits* disqualification of judges even if the alleged prejudice is a result of *judicially* acquired information, in contradistinction to prior law that *required* a judge to hear a case unless he had developed preconceptions by means of extrajudicial" sources, *id.* (emphasis original), the record is completely devoid of any evidence suggesting that the Master's impartiality might reasonably be questioned.

The Master has, however, stated many times on the record that the settlement posture of the parties will be considered separate and distinct from the parties' litigation positions. *See Grinnell Corp.*, 86 S.Ct. at 1710 (disqualification not necessary where trial judge "repeatedly stated that he had not made up his mind on the merits.") The bald assertion of bias, without citation to any specific instances of prejudicial conduct, is insufficient to require disqualification. *See Ouachita National Bank v. Tosco Corp.*, 686 F.2d 1291, 1301 (8th Cir.1982), *aff'd* in relevant part on rehearing, 716 F.2d 485, 488 (8th Cir.1983) (en banc). Accordingly, the challenge to the Master's continued participation in this litigation because of his involvement in settlement discussions is without merit.

## VI. CONCLUSION

This case presents issues seriously implicating the public health as well as the environment. The parties have made great sacrifices thus far in complying with an expedited pretrial discovery schedule designed to prepare this litigation for resolution at the earliest possible time. Because of great effort and supervision by the Special Master, the parties are prepared to conduct an extensive hearing on Phase I issues that may last up to one year, even if tried on a continuous basis. The Court, the Master, and the parties have relied heavily on the longstanding grant of authority of the Special Master to conduct the Phase I hearing. The Constitutional guarantees of Article III have been adequately protected in that the ultimate decisionmaking power in this case shall be exercised by the Court. Exceptional circumstances within the meaning of Rule 53 exist in the form of a compelling public interest necessitating the resolution of Phase I issues as quickly as possible. Such an interest, however, can be satisfied only by the commencement and execution of the Phase I hearing on a continuous basis as presently scheduled. To remove the Master's Phase I authority less than one month before the hearing date would not only eviscerate the product of the expedited pretrial proceedings and lead to added delay at the expense of the parties, but more importantly, such action could needlessly jeopardize the public welfare and the environment. Accordingly, it is hereby

ORDERED that all pending motions to revoke the Special Master's authority to supervise the Phase I hearing and to prepare a Report and Recommendation on Phase I issues are denied.